**LAWYERS' TITLE GUARANTY FUND, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 74–1835.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1975.

Fletcher G. Rush, Orlando, Fla., Randolph W. Thrower, Atlanta, Ga., Kenneth Liles, Laurens Williams, Washington, D. C., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Daniel Perri, Atty., Meyer Rothwacks, Chief, Appellate Sec., Bennet N. Hollander, Atty., Tax Div., Dept. of Justice, Washington, D. C., Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., Richard Farber, Donald H. Olson, Attys., Tax Div., Dept. of Justice, Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., for defendant-appellee.

**2**

Before GEWIN and SIMPSON, Circuit Judges, and NICHOLS,* Associate Judge.

NICHOLS, Associate Judge.

Appellant, Lawyers' Title Guaranty Fund, (hereinafter Fund) sued in the United States District Court after proper requests for refund, to recover United States income taxes alleged to have been overpaid for the short taxable period September 1, 1966 through December 31, 1966, and for calendar 1967. The District Judge upheld the Internal Revenue Service position and dismissed the action with costs. We reverse.

■ The single issue is whether sums credited by appellant as commissions to member lawyers for writing policies of insurance, are deductible when credited in face of the fact they are not normally payable for seven years, and possibly not then. Appellant is on the accrual basis and the issue may also be said to be whether:

> * * * all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * (Treasury Regulation on Income Tax, § 1. 461–1 (a)(2)). *See*, United States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926).

The pertinent rule of law is not seriously in dispute, but the problem is how to apply it to a set of facts which, though largely stipulated below, is nevertheless new to the reported case law, and quite intricate.

Appellant commenced business on January 1, 1948, having been set up under a declaration of trust by a group of Florida lawyers engaged in the examination and approval of title to real estate. Membership is open to any Florida lawyer who meets requirements as to his qualifications. He is authorized to issue in the name of the Fund guarantees of opinions rendered by him with respect to real estate titles. By accepting such a guarantee or policy, the client, *i. e.,* the insured, agrees to look solely to the Fund for satisfaction of any claim based on a title defect, not to the lawyer member individually. Members must make an initial contribution to capital, latterly $200, when admitted, and thereafter, each must contribute additional sums, based on the amount of risk to which he has committed the Fund. At one time this contribution was set at 25% of each attorney's fee earned, more recently a percentage of the policy amount. Apparently there is no provision for payment of a premium directly by the client, but of course it is passed on to him as part of the fee.

The appellee originally treated appellant as a business corporation for income tax purposes. It regarded all the above contributions as made to capital, restricting taxable income to investment income. Reporting under this system, appellant always showed a loss and had no income tax liability. Appellant repeatedly initiated discussions with the IRS as to its tax status, resulting finally in a ruling effective September 1966, reflecting that from that date appellant would be taxed as an insurance company and the additional contributions described above would be deemed premium income under IRC of 1954, § 832(b). Up to a point specified, amounts withdrawn by members would be dividends. The remainder above this point would be deductible as commissions paid to members in their capacity as independent sales representatives.

Sections 35–41 of the Trust Instrument, as amended October 4, 1966, effective September 1, are vital to the controversy and are appended as Exhibit A. It will be noted that Sec. 35 set up the formula by which the so-called commissions are to be calculated, the "Current Allowance Accounts". Sec. 37 tells how Fund losses due to members' negligence shall be offset. The offset applies first against the Current Allowance Account, commencing with the oldest credit. Next the Capital Account and next the Deferred Allowance Account are to be tapped. By Sec. 39 no payment to a member is permitted that would reduce

---

* Of the U. S. Court of Claims, sitting by designation.

the Fund assets below the amount it is required to maintain by law, plus $1,000,000. Sec. 40 is the controversial provision for payment after seven years of the "unimpaired credit balance" of the Current Allowance Account.

Payments out of the Current Allowance Account were delayed for 1966, '67 and '68, one year in each case, because of Sec. 39.

As of December 31, 1966, the Fund had 2,911 active members and 3,213 in all. As of December 31, 1967, the figures were 2,967 and 3,296. In the whole history of the Fund up to December 31, 1971, 83 members had charges made against their accounts for negligence and the total number of claims was 108. One membership was terminated due to negligence or misconduct. This member was also disbarred. Four memberships were terminated for non-payment of bar dues. The Fund substantially reinsures its own risks. It had aggregate losses in excess of the Lloyd's reinsurance deductible amount of $100,000 in only one year. This was a claim in 1963 because of a forgery, and it was closed in 1971 by payment of $40,474 by Lloyds. The Fund has never suffered a net overall economic loss and on December 31, 1966, and December 31, 1967, the aggregate net credits to members' Capital Accounts were $475,482 and $554,353, respectively. The trial court agreed with appellant that any chance "of the Fund being exhausted by the demands upon it is indeed remote." The losses charged to members' accounts due to their negligence up through December 31, 1969, totalled $42,900, only 1.08 per cent of the amounts accrued in the same period for members' Current Allowance Accounts— $3,975,200. The Fund does not pay any selling commissions or have any other selling expenses except the above described so-called commissions.

Though the record does not furnish details, it is apparently assumed as vital to the soundness of the plan above described that under Florida rules relating to prescription and adverse possession, the likelihood is remote that any title

defect will cause serious pecuniary loss if it surfaces more than seven years after a transfer of paper title.

The essentials of the IRS position were set out in their National Office's Technical Advice Memorandum of August 12, 1966:

The provisions of subchapter L of the Code provide that in general all insurance companies shall be on the accrual method of accounting. Under an accrual method, deductions are allowable for the taxable year in which all events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. See section 1.446–1(c)(ii) of the Income Tax Regulations; and United States v. Anderson, 269 U.S. 422 [46 S.Ct. 131, 70 L.Ed. 347] (1926) * * *.

In the instant case, the amounts credited to a member lawyer's account are subject to reduction for payment of losses due to the member's negligence. Such amounts are also in effect subject to reduction pro rata for losses not due to a member's negligence, and for operating expenses of the Fund, in the absence of other funds from which such obligations could be paid, (i. e., in a loss year). Amounts returnable to members clearly cannot be fixed or determinable as long as they remain subject to reduction by payment of outstanding obligations of the Fund. Since this contingency attaches as long as particular amounts are not withdrawable from the Fund, amounts in the members' accounts cannot constitute accrued items until actually paid or become payable to the members.

When one gives the IRS position the careful consideration it deserves, it will be apparent that, according to the IRS, the Fund is not liable to pay the commissions at all events, because of contingencies of two entirely different kinds. One set rises out of the possibility the member may have been negligent and made the Fund liable to pay losses caused by

his own negligence. The other set rises out of the possibility that losses from any other cause may so impair the assets of the Fund that the commissions will not be paid.

With regard to the contingency of losses due to the member's own negligence, they are offset directly against the Current Allowance Account, including the amount of it not yet payable. The trial court found that the intent of the 1966 amendments were that in case of such a loss, the obligation to pay the member would be accelerated to include moneys in the Account for less than seven years, and the member would be paid *pro tanto* by applying these moneys to satisfy the indebtedness due to his negligence.

We may note that the incurrence of this offset liability is entirely within the control of the member, since he can refrain from negligence or he can obtain malpractice insurance, or both. He will never confront an offset due to circumstances beyond his control.·

We also note that the offset is not an intrinsic defect in the claim to the commission itself. The member may fully earn a commission by non-negligent performance, and yet may not be paid it because of his real or alleged negligence in other wholly unrelated transactions. In this regard the Fund's offset claim appears to be a true offset and not a partial or complete defeasance of the commission right itself. Appellant rightly calls our attention to the right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him. United States v. Munsey Trust Co., 332 U.S. 234, 239, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); United States v. Cohen, 389 F.2d 689, 690 (5th Cir. 1967). Appellant represents itself as subrogated to the client's claim against a negligent lawyer, but it would seem the members of the fund, in the circumstances in which they have placed themselves, owe just as high a duty of care to the Fund as they do to their clients. Whether the Fund latches on to unpaid commissions as subrogee to the injured client, or directly, appears to us an academic issue we do not advance ourselves very far by debating. The decisive thing is, the member's claim to his commissions is not a contingent claim dependent on perfection by the happening of the contingency. Rather, it is perfect and vested from the beginning or at least from the calculation of the credit at the close of the fiscal year per Sec. 35. Then if a loss results from the member's negligence, most likely in a wholly unrelated transaction, the credit is divested to make the loss good, not first the credit for the commission negligently earned, but *"beginning with the oldest credit."* (Emphasis supplied). Sec. 37(b) 1. It is a pure offset, and absent any Sec. 37 in the agreement, we would suppose some such offset right would have been implied by law. We will demonstrate *infra,* the significance of the difference between an imperfect right subject to later perfection, a condition precedent, and a vested right subject to divestment, in the application of the "all events" test.

With respect to costs and losses not due to the member's negligence, or not recoverable from the negligent member, we note that so far as incurred in the year the commission was earned, they are deducted from the Fund's income in calculation of the aggregate of member's Current Allowance, per Sec. 35. Once the figure is so fixed, it cannot be deemed to be still subject to partial or entire defeasance by the same costs and losses. Those of other years will normally come before the commissions for those years in the same manner. The entire scheme requires the creation of a Fund which is enormously solid and strong with respect to possible losses not covered by reinsurance. Behind the scheme, too, stands the integrity of the Bar. The normal unwillingness of lawyers to do shoddy work for their clients is here strongly reinforced by the large sums members have in practical effect pledged to secure their faithful performance of their duties in title examination. Members can reasonably expect that hitherto,

as in the past, losses due to negligence will be the rare exception. We think the possibility that a non-negligent member will lose his commissions once credited under the Sec. 35 procedure, by reasons of losses, is too remote to be noticed under accrual accounting, but if it should occur it is still of the nature of a condition subsequent. The prohibition in Sec. 39 against payouts to members that would reduce assets below what it is required to maintain by law, plus $1,000,000, by its own terms effects merely a deferral of payment, not a cancellation of liability.

The parties stipulated that the amount claimed as a deduction for the short period ending December 31, 1966—$21,613.46, represented fair and reasonable compensation for the underwriting services performed by members for that period. Similarly, the amount claimed for 1967—$104,473.93, was fair and reasonable compensation for that period.

Section 832(c)(1) of the IRC of 1954, provides that insurance companies may deduct "all ordinary and necessary expenses incurred as provided in section 162 * * * " Section 162(a)(1) includes as a deduction for business expenses:

a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

The legal issue therefore is, whether the taxpayer could deduct the so-called commissions here involved, under the accrual system of accounting, in face of the delays and restrictions upon actual payment, analyzed above. By the regulation quoted at the beginning of this opinion, this turns on whether all the events have occurred which determine the fact of liability, and the amount can be ascertained with reasonable accuracy. We turn to the case law.

In Comm'r of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1958), the taxpayers were automobile dealers on the accrual basis, who sold their customers' installment paper to finance companies. The latter withheld a portion of the purchase price of the paper, usually 5%, to secure the dealers obligation to make the finance company whole in case of non-payment by the buyer of the car, and to repurchase the car from the finance company if it had to be repossessed. Such sums were put in reserve accounts in the dealer's name and paid over when no longer needed for the finance company's security. The dealers would have excluded money in these reserve accounts from their gross income when not actually paid in the taxable year. The Commissioner's long established policy was to the contrary. The Supreme Court sustained him. It pointed out that the money when put in the account was going to be received in all events and "w[as] vested in and belonged to the respective dealers * * * ", (at 463, 79 S.Ct. at 1280). The dealers were deemed to have agreed to accept payment either in cash or in offset of liabilities.

The relationship of this case to the issues before us hardly needs to be pointed out.

In W. S. Badcock Corp. v. Commissioner of Internal Revenue, 491 F.2d 1226 (5th Cir. 1974), the taxpayer sold furniture through dealers on consignment, generally on credit. It accrued the purchase prices, when unpaid, and the selling commissions also. The IRS would have disallowed the latter while letting the former stand. This court held for accrual of the commissions in face of language in the dealer contract, seeming to say that commissions were not "earned or due" until the furniture was paid for. It viewed the language as not meaning exactly what it said, for reasons that need not here concern us, and relied on the course of dealing between the parties showing that the dealers customarily dealt with the unpaid commissions as their own property. The court rejected the view that the right to commissions was "contingent" on collections. The court cites, among other authorities, Central Cuba Sugar Co. v. Commissioner of Internal Revenue, 198 F.2d 214, 217 (2d Cir.), cert. denied, 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952). This case involved accrual of brokerage commissions that might be forfeited but this

was viewed as a "condition subsequent." See other cases cited in *Badcock*, 491 F.2d fn. 4 at 1228. The "all events" test is recognized but regarded as not failed merely because a "condition subsequent" may interfere with actual payment.

In those cases, unlike here, the "condition subsequent" that thwarts payment of the commission may be something outside the control of the payee. Moreover, the offsets here involved may be regarded as not even conditions subsequent inasmuch as they do not necessarily relate at all to the transactions in which the commissions were earned. These differences make the instant case *a fortiori* after *Badcock*.

In all these cases the decision for accrual is aided by the fact that only by accruing the selling expense can the cost of selling be matched up with the sales price, and only by such matching up can we achieve an accurate reflection of the taxpayer's income on an annual basis. Gillis v. United States, 402 F.2d 501 (5th Cir. 1968).

Appellee in this case may be troubled by the long time the Fund detains the commissions and their use meanwhile as security to hold the Fund harmless in case of negligence of the member. It has not, however, cited any regulation or case authority that requires a difference of treatment on this account. In *Hansen, supra,* delay in payout times of up to 60 months is treated as of no concern. In Washington Post Co. v. United States, 186 Ct.Cl. 528, 405 F.2d 1279 (1969), it was held that the Post could accrue accounts it set up for its dealers as a group, though payment would not be made for many years and the time of payment was uncertain. Individual dealers could forfeit their interests, but then they were divided among other dealers, and did not revert to the paper. Since the liability was fixed, it was held that possible delays in payment were not fatal under the "all events" test, which was, as in all well considered cases in this area, assumed as the starting point of analysis. That case is followed and cited under somewhat similar facts in

Lukens Steel Co. v. Commissioner of Internal Revenue, 442 F.2d 1131 (3rd Cir. 1971).

■ In summary, we think the case law is that the tax accrual of a liability to pay commissions to a selling agent is not defeated by the right of the principal to defer actual payment to secure payment of liabilities the selling agent may incur to the principal in unrelated transactions, and to offset the commissions with such liabilities if incurred. The law also is that a bare possibility of non-payment or delay in payment because of the principal's financial condition does not defeat accrual either. We see this result as sound beyond question, under accrual accounting.

It follows that the decision below must be and is reversed. Because of other adjustments, the amount of the disallowances here dealt with are not claimed as lump sums and the case must be remanded for further proceedings in light of the conclusions stated herein, including determination of the amounts due and owing by appellee to appellant, for the taxable years involved, and interest as provided by law.

Reversed and remanded.

## APPENDIX

### EXHIBIT A

*Section 35.* CURRENT ALLOWANCE ACCOUNTS: Each Member shall have a Current Allowance Account to which shall be credited annually an amount in respect to his Additional Contributions for that year, determined as follows. The aggregate of all Members' Current Allowances for each year shall be an amount equal the excess of (a) the sum of The Fund's income for the year from all sources, including amounts released during the year from The Fund's unearned premium reserve, but excluding the unearned portions of Additional Contributions on guarantees and policies written during the year which have been added to The Fund's unearned premium reserve, over (b) the sum of (1) The Fund's expenses for the year, including

all amounts computed under Section 36 (whether or not credited to Members' Deferred Allowance Accounts) but excluding the Members' Current Allowances provided for in this Section, (2) The Fund's claim losses for the year, (3) such percentage of the aggregate net credits to Members' Capital Accounts at the end of the year as the Trustees from time to time shall have determined but which shall not be less than seven percent (7%) nor more than ten percent (10%), and (4) the net gain or loss realized by The Fund on disposition of any assets during the year. The aggregate amount of all Members' Current Allowances for such year as so determined shall be allocated among and credited to the Members' respective Current Allowance Accounts in the proportion which each Member's Additional Contributions for guarantees and policies written by him during the year bears to the aggregate of all such Additional Contributions.

*Section 36.* DEFERRED ALLOWANCE ACCOUNTS: Each Member shall have a Deferred Allowance Account to which shall be credited, as of the close of each year, an amount equal to the proportion of the aggregate amounts released during the year from The Fund's unearned premium reserve which said Member's Additional Contributions for guarantees and policies written by him during the year in respect of which such released amounts originally were added to said reserve bears to the aggregate of all Additional Contributions of all Members for guarantees and policies written during the year in which such released amounts originally were added to such reserve.

NOTE: (a) The statutory reserve period at the time of adoption of this Section 36 is ten years.

(b) Although the amount of Deferred Allowances will be determined each year commencing with the year 1966 for the period September 1, 1966, through December 31, 1966, and for each year thereafter for The Fund's accounting purposes and the purposes of Section 35(B)(1), no Deferred Allowances will be credited to Members' Deferred Allowance Accounts under this Section until December 31, 1976, at which time the unearned premium reserve for the period September 1, 1966, through December 31, 1966, will be released, because the statutory unearned premium reserve period is 10 years and amounts reflecting the unearned premium reserves for all periods prior to September 1, 1966, already, prior to the effective date of this Section 36, either have been refunded to Members or credited to other, previously existing, accounts of Members.

*Section 37.* LOSSES:

(a) If a loss occurs from a cause that would not result in civil liability of the Member who wrote the guarantee or policy under which the loss occurs, and the Claim Committee so finds, the entire loss shall be borne by The Fund.

(b) If a loss occurs from a cause other than set forth in (a) above, the loss shall be offset against the credits in the various Accounts of the Member who wrote the guarantee or policy in the following sequence:

1. Member's Current Allowance Account beginning with his oldest credit.

2. Member's Capital Account.

3. Member's Deferred Allowance Account.

(c) If the Claim Committee determines that a loss occurred from a combination of causes set forth in (a) and (b) above, it may apportion the loss between The Fund and the Member.

(d) Any recovery of a loss, by subrogation or otherwise, less the expense of the recovery, shall be applied, in inverse sequence to that stated in paragraph (b) above, to restore any amount charged against the Member on account of the loss, and any excess shall belong to The Fund; provided, if a loss has been apportioned under (c) above, recoveries shall be applied in the same ratio as they were apportioned under (c) above.

*Section 38.* ALLOCATION OF NET EARNINGS: DIVIDENDS: As of the end of each year, the net earnings of The Fund for the year shall be allocated

among the Members in proportion to their net credit balances in their respective Capital Accounts. The amounts so allocated to the Members either shall be distributed to the Members as dividends, in whole or in part, or shall be credited to the Members' respective Capital Accounts, as the Trustees annually shall determine; provided, if any amount so to be credited would increase any Member's Capital Account beyond any maximum which the Trustees may have established, such excess shall be distributed to such member.

> NOTE: The term "net earnings of The Fund" means the excess of (A) The Fund's income from all sources (including amounts released during the year from the unearned premium reserve but excluding the unearned portions of Additional Contributions on guarantees and policies written during the year which have been added to The Fund's unearned premium reserve) over (B) all of The Fund's claims losses and expenses for the year, including all amounts credited to Members' Current Allowance Accounts and all amounts computed under Section 36 (whether or not credited to Members' Deferred Allowance Accounts).

*Section 39.* INTEGRITY OF FUND: The integrity of The Fund must be maintained. Any payment to or withdrawal by any Member, which, if made, would reduce The Fund's assets below the amounts which it is required by law to have and maintain plus one million dollars ($1,000,000) shall be deferred until making it will not reduce The Fund's assets below such sum. Any discretionary authority in the Trustees to make any payments or distributions or to allow any withdrawals shall be exercised by the adoption from time to time of procedural policies applicable to all similar circumstances while they are in effect, and shall be subject to the above limitation.

*Section 40.* PAYMENT OF MEMBERS' CURRENT ALLOWANCES: The Trustees may, of their own accord, pay to the Members all or any portion of the credit balances that have existed in their Current Allowance Accounts for seven years; provided, subject only to Section 39, if the Trustees do not cause the same to be promptly paid, any Member, former Member, or the legal representatives, heirs, legatees or distributees of any deceased Member, may at any time withdraw all or any part of any unimpaired credit balance that existed in such Member's Current Allowance Account seven years before the application for withdrawal is made.

*Section 41.* PAYMENT OF MEMBERS' DEFERRED ALLOWANCES: The Trustees may at any time, of their own accord, pay to the Members all or any portion of the credit balances in their Deferred Allowances Accounts; provided, subject only to Section 39, if the Trustees do not cause such credit balances to be promptly paid, any Member, former Member, or the legal representatives, heirs, legatees or distributees of any deceased Member, may at any time withdraw all or any part of any unimpaired credit balance in such Member's Deferred Allowance Account.