IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60102
_____

VALERO ENERGY CORPORATION AND
SUBSIDIARIES,

                          Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

                          Respondent-Appellee.

_____

Appeal from the United States Tax Court
_____
March 14, 1996

Before KING, DAVIS, and SMITH, Circuit Judges.

KING, Circuit Judge:

    The original majority opinion and dissent in this case,
Valero Energy Corp. v. Commissioner, No. 95-60102, slip op. at
1846 (5th Cir. Feb. 6, 1996), are withdrawn and the following
majority opinion and dissent are substituted in their place:

    Taxpayer corporation filed a petition in the tax court
contesting the Internal Revenue Service's determination that
taxpayer had overstated its 1984 net operating loss by taking a
double deduction for payments made pursuant to a settlement
agreement.  The tax court affirmed the determination, concluding
that the deduction was correctly disallowed.  Taxpayer appeals.
We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts in this case are not disputed; many of them are stipulated.  Valero Energy Corporation ("Valero") is a Delaware corporation that had its principal offices in San Antonio, Texas, when the petition in this case was filed.  The predecessor of Valero was a subsidiary of Coastal States Gas Corporation ("Coastal").  Valero and Coastal have always used the accrual method of accounting for federal income tax purposes.

In the early 1970s, Coastal and its subsidiaries were sued by natural gas customers for breach of natural gas delivery contracts.  The Texas Railroad Commission ruled that the customers were due refunds in excess of $1.6 billion as a result of those breaches.  In the settlement negotiations that followed this ruling, the customers demanded, inter alia, that the refund obligations be satisfied with cash.  Coastal and its subsidiaries, however, did not have the capacity to make such cash payments.  The customers' next preference was debt securities, but this method of payment was also infeasible.  Therefore, the customers agreed to accept equity securities and other negotiable instruments in lieu of cash or debt securities.

To implement the settlement, the parties executed a settlement plan ("the Plan").  One of the provisions of the Plan was that Valero would be spun off from Coastal as an independent corporation.  In addition, a trust ("the Settlement Trust") was established for the benefit of the settling customers.  Pursuant to the Plan, Valero transferred into the Settlement Trust various

2

amounts of different equity securities and a promissory note, all done in settlement, payment, and satisfaction of the settling customers' claims. The spinoff and transfer of property to the Settlement Trust occurred on or about December 31, 1979.

Among the assets transferred into the Settlement Trust were 1.15 million shares of newly-issued Valero $8.50 Cumulative Series A Preferred Stock ("Valero Series A Stock"). When Coastal and Valero first proposed including this stock in the settlement package, the customers refused to accept it without an assurance from Coastal and Valero as to the amount of proceeds that would be realized from the stock. Coastal and Valero initially rejected such a provision, but later relented when restrictions were placed on the sale and redemption of the stock. Accordingly, the Settlement Trustee was authorized to sell the Valero Series A Stock (subject to certain restrictions), to receive dividends (if any),[1] and to distribute the sale proceeds and dividends to the settling customers. The customers were only entitled to the proceeds from the disposition of the stock, and not the stock itself; if any of the stock remained as of December 1, 1986, Valero's Certificate of Incorporation required it to begin redeeming the stock at a rate of 57,500 shares per year. Under the Plan, Valero gave its assurance[2] that the Settlement

---

The Plan did not obligate Valero to declare any dividends on the Valero Series A Stock because such action would depend on Valero's earnings and financial condition.

Both parties refer to this assurance as a "guarantee." As the tax court correctly points out, however, this covenant was not a guarantee in the true sense of the word, whereby the

3

Trust would realize at least a total of $115 million from the sale or redemption of and dividends on the stock by April 29, 1988: When the Settlement Trustee disposed of the last of the Valero Series A Stock, it would determine the aggregate amount of proceeds collected from sales and dividends; if this amount was less than $115 million, Valero would make up the difference.[3]

The Plan also provided that, for purposes of the settlement and federal income tax obligations, the value of the Valero Series A Stock was its liquidation value of $115 million.[4] This arrangement was described in a prospectus, dated February 14, 1979, that was issued to the settling customers in connection with the customers' approval of the Plan. The prospectus advised the customers, inter alia, that: (1) the Plan provided that all parties would treat the Valero Series A Stock as having a value of $115 million; (2) in computing its taxable income, Coastal or Valero would claim in the year of settlement a deduction equal to the agreed value of the Valero Series A Stock; and (3) each settling customer subject to federal income tax may recognize ordinary income reflecting receipt of its proportionate interest

---

guarantor agrees to pay an obligation in the event of a default by the principal obligor. In addition, the Plan itself uses the word "assure."

If the proceeds from the stock exceeded $115 million, the excess was to be included in the distribution to the settling customers. Valero did not make similar assurances with respect to the other assets in the Settlement Trust.

During this litigation, the parties stipulated that the fair market value of the Valero Series A Stock in 1979 was, in fact, $89.1 million.

4

in the Settlement Trust at the time that the securities, including the Valero Series A Stock, were transferred to the Settlement Trust. Coastal, Valero, and Coastal's other subsidiaries filed a consolidated federal income tax return for 1979. Pursuant to a tax deconsolidation agreement between Coastal and Valero, effected as part of the Plan, (1) Valero deducted $115 million in respect of its transfer of its own preferred stock to the Settlement Trust; (2) the deduction was reported on the Coastal group's consolidated tax return; and (3) Valero was paid $50 million by Coastal in respect of the Coastal group's tax benefit from Valero's deduction.

Between 1980 and 1984, the following transactions occurred with respect to the Valero Series A Stock in the Settlement Trust:

      (1)  Valero paid approximately $34.5 million in dividends on the stock.

      (2)  An unrelated party, Variable Annuity Life Insurance Company, purchased 230,000 shares of the stock for approximately $12.4 million.

      (3)  In two separate transactions, Valero redeemed a total of 920,000 shares of the stock for approximately $48.3 million.

When Valero redeemed the last of the stock held by the Settlement Trust in August 1984, the Trust had only received approximately $95.2 million from the transactions listed above. This was partly the result of a decline in the value of Valero securities between August 1983 and August 1984. Accordingly, in August 1984, pursuant to the assurance it had made in the Plan, Valero

5

paid approximately $19.8 million into the Settlement Trust -- the difference between the $115 million assured in the Plan and the $95.2 million actually realized by the Settlement Trust from the disposition of and dividends on the stock. Valero deducted this $19.8 million payment on its 1984 federal income tax return.

On August 29, 1990, the Internal Revenue Service ("IRS") issued a notice of deficiency to Valero asserting, inter alia, that Valero had overstated its 1984 net operating loss by $19.8 million -- i.e., the amount it deducted for paying the shortfall in the amount realized by the Settlement Trust from the disposition of the Valero Series A Stock. Valero filed a petition in tax court contesting this determination.[5] Specifically, Valero claimed that the two deductions were separate because they were related to two separate obligations under the Plan: (1) the obligation to transfer to the Settlement Trust the 1.15 million shares of Valero Series A Stock, which had an agreed value of $115 million; and (2) the obligation to pay for any difference between $115 million and the amount realized from the disposition of and dividends on the stock. In response, the Commissioner of Internal Revenue ("the Commissioner") argued that Coastal had accrued and deducted the entire amount of its obligation to the settling customers in 1979, including any future payments that might be required by the assurance that the customers would realize at least $115 million from the stock.

_____

Other issues were involved in the notice of deficiency, but these were resolved before trial.

Accordingly, the Commissioner argued that Valero's 1984 deduction of the $19.8 million payment was an improper double deduction of an amount previously deducted in 1979. The Commissioner further contended that the duty of consistency in tax reporting precluded Valero from taking the 1984 deduction.

The tax court concluded that the Commissioner was correct in disallowing the $19.8 million deduction in 1984. The court explained that Valero's assurance that the settling customers would receive $115 million from the disposition of the stock was "an integral part of a unified plan and agreement that settled all claims," and therefore, each payment under the Plan could not be considered a separate liability. Consequently, the court held that Coastal's $115 million deduction in 1979 included any subsequent payments that Valero might have become obligated to make under the assurance, so that Valero's 1984 deduction of the $19.8 million payment was an improper double deduction. Having so held, the court did not reach the duty of consistency issue. Valero timely appealed.

## II. DISCUSSION

We review the decision of a tax court under the same standards that apply to district court decisions. Thus, issues of law are reviewed de novo, and findings of fact are reviewed for clear error. Park v. Commissioner, 25 F.3d 1289, 1291 (5th Cir.), cert. denied, 115 S. Ct. 673 (1994); McKnight v. Commissioner, 7 F.3d 447, 450 (5th Cir. 1993). Because the facts

7

of this case are undisputed and the parties' contentions concern purely legal issues, our entire review will be de novo.

Valero contends on appeal that the $19.8 million payment it made in 1984 was not included in the $115 million deduction taken by Coastal in 1979. First, Valero argues that the 1979 deduction does not represent an obligation by Valero to pay $115 million to the settling customers, but rather, it represents the value of the Valero Series A Stock that was transferred to the Settlement Trust. Because the deduction was for the value of the stock transferred, Valero argues that it could not have included any future payments that Valero had to make under the assurance that the customers would receive $115 million from the stock.

Second, Valero contends that there were two deductions because there were two separate obligations under the Plan related to the Valero Series A Stock: There was a fixed obligation to transfer the stock, which had an agreed value of $115 million, to the Settlement Trust. There was also a second, contingent obligation to pay for any difference between $115 million and the amount that the Settlement Trust realized from the disposition of and dividends on the stock. Valero took a deduction for what it paid under each of these obligations. As evidence of the distinctiveness of these obligations, Valero points to the sequence in which the settlement terms were negotiated, noting that the assurance covenant was added some time after the parties had agreed that the Valero Series A Stock would be transferred to the Settlement Trust.

8

Finally, Valero contends that there never was an obligation for Valero to pay the settling customers $115 million, and consequently, the 1979 deduction could not have been for the accrual of this obligation. Valero maintains that its obligation to pay the difference between $115 million and the amount ultimately realized by the Settlement Trust from disposition of the stock is not the same as an obligation to pay the settling customers $115 million. As evidence that no such obligation existed, Valero points out that some of the $115 million received by the customers did not come from Valero, but rather from an unrelated company who purchased some of the Valero Series A Stock. In this same vein, Valero notes that another portion of the $115 million came from its payment of dividends on the stock, dividends that all parties agree Valero was not obligated to pay. Valero also notes that the 1979 deduction could not have contemplated an obligation to make future payments under the assurance provision because there was no way to know in 1979 whether Valero would ever have to pay anything under this provision. Because its obligation under the assurance provision was contingent on future events, Valero argues that this obligation did not accrue in 1979, and therefore, was not part of the $115 million deduction taken by Coastal.

The Commissioner counters that, in 1979, Valero undertook a contractual obligation that the settling customers would receive $115 million from the disposition of and dividends on the Valero Series A Stock, and that Coastal deducted this liability on its

9

1979 federal income tax return. In this regard, the Commissioner points out that the parties have stipulated that the stock's fair market value when transferred to the Settlement Trust was in fact only about $89.1 million, and therefore, the $115 million deduction taken by Coastal must have included more than the value of the stock. Because the entire $115 million obligation accrued and was deducted in 1979, the Commissioner contends that any future payments in satisfaction of this obligation were included in the 1979 deduction.

The Commissioner also argues that there were not two separate obligations under the Plan related to the Valero Series A Stock. The Commissioner points out that the transfer of the stock and the assurance provision were part of an integrated agreement designed to ensure that the settling customers received $115 million from one of the assets transferred to the Settlement Trust. In this regard, the Commissioner notes that the customers would not have accepted the transfer of the stock without the assurance provision and that the transfer and assurance are both described in the same paragraph of the Plan. Therefore, the Commissioner argues that the order in which these items were discussed in the settlement negotiations is irrelevant.

Finally, the Commissioner maintains that the Plan created a contractual right in the settling customers to receive $115 million, regardless of whether the funds came from sales of the stock, dividends paid on the stock, or direct payments by Valero. In other words, the overall liability to pay $115 million was

10

fixed in 1979, although the source of the funding was contingent on future events. Because this obligation was established in 1979, the Commissioner contends that Coastal properly deducted it in that year, and that the deduction included any future payments that might be made in support of the obligation. In this regard, the Commissioner quotes Helvering v. Russian Finance & Constr. Corp., 77 F.2d 324, 327 (2d Cir. 1935), for the proposition that "[t]he existence of an absolute liability is necessary [for the liability to be deducted]; absolute certainty that it will be discharged by payment is not."

Our decision in this case depends upon whose interpretation of the settlement is correct. Valero's interpretation is that it had two separate obligations regarding the stock -- one to transfer the stock to the Settlement Trust and one to pay any difference between $115 million and the income generated by the stock. Valero then contends that these two separate obligations gave rise to two separate tax consequences -- a $115 million deduction for the transfer of the stock and a $19.8 million deduction for satisfaction of the assurance provision. The Commissioner counters that Valero had one obligation -- to ensure that the settling customers received $115 million from the payment of the Valero Series A Stock into the Settlement Trust and the operation of the assurance provision -- with one tax consequence -- the $115 million deduction for this accrued obligation. The Commissioner characterizes the later payment of

11

$19.8 million as in support of this previously deducted obligation and thus not deductible itself.

We believe that the Commissioner's interpretation of the settlement is the correct one. Viewing all the facts and circumstances of the settlement, it is abundantly clear that Valero had a contractual obligation to the settling customers in the amount of $115 million. It is equally clear that the transfer of the Valero Series A Stock and the assurance were inseparable provisions that operated in concert to extinguish this obligation, and therefore should not be characterized as distinct liabilities.

First, in a real sense, Valero's obligation to the customers did not arise out of the Plan, but out of the Railroad Commission's ruling that the customers were entitled to refunds. The Plan did not generate a new obligation as such, but established the amount of the obligation and the means by which Valero and Coastal were to satisfy that obligation. The amount of the portion of that obligation relevant in this case was ascertainable in 1979 from Valero's assurance that the customers would receive at least $115 million in cash as part of the settlement. The transfer of the Valero Series A Stock to the Settlement Trust and the assurance provided the mechanism whereby the customers received that $115 million. Therefore, the relevant portion of Valero's obligation to the customers was fixed at $115 million in 1979.

12

Further, it is inappropriate to characterize the transfer of the Valero Series A Stock and the assurance as two separate obligations because the course of the settlement negotiations and the terms of the Plan indicate that these provisions are properly viewed as inseparable. First, we note that the customers initially demanded cash for satisfaction of the refund obligations. Had Coastal and Valero been able to meet this demand, the customers would have received at least $115 million in cash as part of the settlement and the Valero Series A Stock would never have entered the negotiations. Because Coastal and Valero were unable to generate the necessary cash, the customers agreed to accept the proceeds of the stock instead. The customers would not have accepted this arrangement, however, without Valero's assurance that the customers would realize at least $115 million from the disposition of the stock. The customers' demand for the assurance is understandable; the expected proceeds from this newly-issued stock from a newly-formed company were necessarily uncertain and speculative. Without the assurance, the stock would not have been issued because there would not have been a settlement. Indeed, the inclusion of the stock transfer and the assurance in the same section in the Plan reflects the conjunctive nature of these provisions. As the tax court stated, "Valero's assurance that the settling customers would realize at least $115 million in proceeds from the series A preferred stock was an integral part of a unified plan and agreement that settled all claims against

13

Lo-Vaca, Valero, and Coastal."  Therefore, to parse the stock transfer and assurance provisions of the Plan into separate obligations is to belie the economic realities of the parties' settlement.  Cf. Washington Post Co. v. United States, 405 F.2d 1279, 1283 (Ct. Cl. 1969) (while "analytically possible," misleading to view each relationship under taxpayer's incentive plan as a separate liability where import of plan as a whole dictates that relationships be viewed together).

This explanation of the settlement becomes clearer when it is observed that the customers ultimately received what they had originally demanded -- cash.  Valero could not satisfy this demand in 1979 because it did not have the cash on hand. Therefore, it was necessary for Valero to create an income-generating asset to produce the cash that the customers wanted. Of course, it would have been inappropriate for Valero, as an adverse party, to manage this asset to produce income for the customers.  Consequently, the asset was transferred to a third party -- the Settlement Trustee -- to manage the asset for the benefit of the customers.  This transfer was only temporary; that is, the customers did not have permanent ownership of the stock, as Valero was required to redeem the stock after a certain date. Rather, the customers held the stock for a discrete period while it generated cash to satisfy the $115 million obligation to the customers.  While the customers temporarily held the stock, the assurance provision shifted the risk of loss due to fluctuation in the stock's value to Valero, so that the customers were

14

insured a minimum return regardless of the stock's performance. Therefore, the Valero Series A Stock and the assurance provision are more appropriately viewed as the means by which Valero satisfied its $115 million obligation to the customers, as opposed to obligations unto themselves.

Because Valero had only one liability to the settling customers with respect to the Valero Series A Stock, only one deduction was proper. An accrual basis taxpayer may deduct a business expense in the first year in which the taxpayer "incurs," or becomes liable for, that expense, regardless of when the taxpayer actually pays the expense. Treas. Reg. § 1.461-1(a)(2); United States v. Anderson, 269 U.S. 422, 424 (1926). Whether a taxpayer has incurred an expense is governed by the "all events" test. Under this test, all the events must have occurred that establish the liability, and the amount must be capable of being ascertained with reasonable accuracy. Id. As stated above, Valero incurred a liability to the settling customers when the Railroad Commission ruled that the customers were entitled to refunds. The amount of a portion of that liability was ascertainable by reference to the assurance provision in the Plan, which fixed that amount at $115 million. Because the Plan was implemented in 1979, Coastal properly took a deduction in the amount of $115 million in that year.

We recognize that in 1979 it was uncertain whether Valero would ever have to make any payments pursuant to the assurance provision; such payments were dependent on the performance of the

15

Valero Series A Stock.  This uncertainty, however, does not undermine the propriety of the $115 million deduction in 1979. When a liability is fixed, "other uncertainties do not necessarily destroy that initial certainty."  United States v. Hughes Properties, Inc., 476 U.S. 593, 600 (1986).  Stated differently, "[t]he existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not."  Russian Finance & Constr. Corp., 77 F.2d at 327; see also Washington Post, 405 F.2d at 1284 (noting that certainty of liability is significant for tax purposes, as opposed to certainty of time over which payment is made or certainty as to identity of payees).  Therefore, the deduction of the $115 million liability in 1979 was proper, even if the amount or time of payments in support of that liability under the assurance provision was uncertain.

Finally, because Coastal deducted the entire $115 million liability when it was incurred in 1979, it was improper for Valero to take further deductions when the liability was actually extinguished by payment.  As such, Valero's 1984 deduction of the $19.8 million payment made pursuant to the assurance provision was an improper double deduction.  Accordingly, the IRS and the tax court correctly determined that this deduction should be disallowed.[6]

---

Having so held, we need not reach the duty of consistency issue.

16

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the tax court.[7]

JERRY E. SMITH, Circuit Judge, dissenting:

Valero Energy Corporation ("Valero") realized every tax-payer's dreamSSit took an improper deduction, and the Commissioner of Internal Revenue (the "Commissioner") decided not to challenge it. Rather than acknowledge that she has forfeited her right both to challenge the 1979 deduction and to invoke the "duty of consistency,"[8] the Commissioner wants to exact a pound of flesh by challenging the 1984 deduction. I am puzzled by the

---

We decide this case under the version of the Internal Revenue Code of 1954, and the Treasury Regulations thereunder, that were in effect in 1979. The result we reach today may have been different if Valero's obligation under the Plan had been incurred after July 18, 1984, the effective date of I.R.C. § 461(h). Since that date, I.R.C. § 461(h)(2) and Treas. Reg. § 1.461-4(g)(2) have required that an accrual method taxpayer's obligation to make a payment or a series of payments to another person, arising under, inter alia, a breach of contract, is not deductible until economic performance occurs, defined as when payment is actually made to the person to whom the obligation is owed. This change was occasioned by a time-value-of-money "loophole" resulting from an accrual method taxpayer's taking a full deduction for the year in which an obligation to make periodic payments that extend well into the future is incurred. See Boris I. Bittker and Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 105.6.4 (2d ed. 1992 & Supp. 1995) (discussing Burnham Corp. v. Commissioner, 878 F.2d 86 (2d Cir. 1989), a case illustrating the problem).

[8] The "duty of consistency" is an equitable doctrine that prevents a taxpayer from taking one position one year, and a contrary position in a later year, after the limitations period has run on the first year. As I discuss later, the duty of consistency is unavailable to the Commissioner in this case. As a result, if she wishes to challenge the 1984 deduction, the Commissioner must argue that the 1979 deduction was proper.

-17-

Commissioner's position, because in arguing that the 1979 deduction was proper, she undermines her position in countless cases for the sake of a victory in the instant case.

The majority's mistake is that it sees only two options in this case: reconcile the 1979 and 1984 deductions, or disallow the 1984 deduction.[9]  Those are the only choices only if one begins with the assumption that a taxpayer should always reimburse the Treasury for improper deductions.  When, as in this case, the limitations period has run, courts are left with a third choice: allow the later deduction; acknowledge that the earlier deduction was improper; and admit that the "duty of consistency" is the only barrier that prevents the taxpayer from gaining a windfall.

This case calls for the third choice:  The 1979 deduction was improper, the 1984 deduction was proper, and the duty of consistency does not apply.  This is so because, in 1979, Valero replaced its obligation to pay the settling customers $115 million in cash with an obligation to deposit 1.15 million shares of Series A stock in a trust fund and to make up the difference, *if any*, between $115 million and the revenues of the trust.

At that time, Valero was entitled to deduct the fair market value of the stock, $89.1 million, because that obligation accrued and in fact was fulfilled in 1979.  Any remaining cost of

---

[9] *See* Maj. Op. at 11 ("Valero's interpretation is that it had two separate obligations regarding the stockSSone to transfer the stock to the Settlement Trust and one to pay any difference between $115 million and the income generated by the stock.  Valero then contends that these two separate obligations gave rise to two separate tax consequencesSSa $115 million deduction for the transfer of the stock and a $19.8 million deduction for satisfaction of the assurance provision.").

satisfying the settlement agreement could not be deducted, because it was a future expense "based on events that have not occurred by the close of the taxable year." *United States v. General Dynamics Corp.*, 481 U.S. 239, 243-44 (1986). That is to say, in 1979 any further liability was conditional on (1) the trustee's disposing of the stock *and* (2) the existence of a shortfall in the trust. If, for example, the value of the stock had increased substantially in the hands of the trustee, there would have been no shortfall for which Valero would have to compensate, and the contingent liability would have evaporated.

Any windfall for the taxpayer was created by the Commissioner's negligence. The Commissioner could have challenged the 1979 deduction and collected back taxes; she chose instead to challenge the 1984 deduction. As a result, the statute of limitations on the 1979 return has now run. The matter is made worse by the fact that the Commissioner had notice of Valero's inconsistent treatment of the 1979 deduction before the end of the limitations period.

Thus, the "duty of consistency" does not prohibit Valero from claiming that the 1984 deduction was proper. If the Commissioner had taken the sensible litigation strategy and challenged both the 1979 and the 1984 deductions, Valero would not receive a windfall.

I.

-19-

The correct way to determine Valero's tax liability in 1979 is to focus on the substance of its obligations and ask what it was obligated to pay in that year. Under the settlement agreement, Valero contributed stock with a stipulated market value of $89.1 million to a trust fund. It also had a *contingent* obligation to make up the difference between $115 million and the proceeds to the trust, if and only if the stock did not realize sufficient appreciation, and produce sufficient dividends, to generate the remaining $25.9 million. The only question is whether Valero could take a deduction for that future, contingent obligation.[10]

Importantly, under the "all events" test, a liability does not accrue until "the last link in the chain of events creating liability" has occurred. *General* Dynamics, 481 U.S. at 245. *General Dynamics* illustrates how strict the "all events" test is.[11] There, the taxpayer sought to deduct estimates of its

_____

[10] The majority cites *Washington Post Co. v. United States*, 405 F.2d 1279, 1283 (Ct. Cl. 1969), for the proposition that a court may not "parse the stock transfer and assurance provisions of the Plan into separate obligations" in order to "belie the economic realities of the partes' settlement." Maj. Op. at 14. But the majority fails to explain how this settlement agreement is analogous to the bonus plan at issue in *Washington Post*, other than to cite two words from a six-page opinion. *Id.*

A close reading of *Washington Post* indicates that the court was more concerned with the substance of the transaction than with the formal structure of the plan. 405 F.2d at 1283 ("So we view this Plan for what it functionally is . . . ."). The majority does exactly what the *Washington Post* court cautioned againstSSit focuses on the form of the settlement agreement rather than the substance of the transaction.

[11] In the usual case, the "all events" test protects the Treasury by deferring uncertain deductions into future years. The net result is that the risk of taxpayers' overestimating future obligations and thus, deductions, is reduced. In this case, in order to reach a result that easily could have been reached if the Commissioner had challenged the 1979 deduction, the Commissioner

(continued...)

-20-

obligations to pay for the medical care of its employees. The medical care was obtained by the employees in the fourth quarter of the year, but the taxpayer had yet to receive reimbursement forms from those employees. *Id*. at 240. The Court disallowed the deduction, noting that for a future obligation to be deductible, the liability must first be firmly established. *Id.* at 243. The liability had not been established, because the taxpayer was liable only if properly documented forms were filed. Until that event occurred, the taxpayer might not be liable for the medical services. *Id.* at 244-45.

Like the taxpayer in *General Dynamics*, Valero did not have an established liability in 1979. Until an event occurred that changed the status quo, Valero faced no liability. The final link in the chain of events was the disposition of the stock by the Trustee. Until the stock was sold, there was no liability, because there was no shortfall in the trust.

## II.

The majority opinion is based on the claim that "the Valero Series A stock and the assurance provision are more appropriately viewed as the *means* by which Valero satisfied its $115 million obligation to the customers, as opposed to obligations unto themselves." Maj. Op. at 15. Because the settling customers

---

(...continued)
asks us, in effect, to make it easier for a taxpayer to deduct uncertain future liabilities. While such an approach benefits the Treasury in this particular case, it reduces tax revenues in other cases. Accordingly, I question both the wisdom and the propriety of the Commissioner's position in the case *sub judice*.

were entitled to $115 million in cash from the Railroad Commission's ruling, the majority reasons that the Settlement Agreement did not affect that fixed liability, but only established a contractual payment schedule.  Maj. Op. at 16.  This raises the question of what the majority means by "fixed."[12]

The first problem with the majority opinion is that it focuses on form over substance.  The *only* reason the majority gives for the conclusion that Valero's obligation was "fixed" is that Valero's initial liability was $115 million, and the settlement agreement replaced that liability.  Thus, the majority characterizes the settlement agreement as a single obligation

---

[12] The majority correctly states that "[w]hen a liability is fixed, `other uncertainties do not necessarily destroy that initial certainty.'" Maj. Op. at 16 (citations omitted).  The majority's characterization of the liability as "fixed" begs the question, however.

Moreover, cases cited by the majority are distinguishable.  *I.e., United States v. Hughes Properties, Inc.*, 476 U.S. 593, 600 (1986) (holding that the uncertainty as to when a slot machine will pay a jackpot does not make a liability contingent, because the fact that state law prohibits an operator from changing the odds makes liability certain); *Helvering v. Russian Fin. & Constr. Corp.*, 77 F.2d 324, 327 (2d Cir. 1935) (holding that liability accrued when condition in contract was fulfilled, even though a condition subsequent could erase the liability in the future); *Washington Post*, 405 F.2d at 1284 (holding that incentive program in which taxpayer was irrevocably committed to paying a certain sum was not a contingent liability even if the class of recipients and timing of payment was uncertain).  In both *Hughes* and *Washington Post*, the taxpayer entered into an irrevocable agreement to pay a sum certain.  The final event creating liability had occurred, and only the recipient and timing were uncertain.  In the instant case, it was uncertain, in 1979, whether Valero would ever have to make payments (and if so, the amount of such payments) under the settlement agreement.

*Russian Finance* (which, coming from another circuit, is not binding on us) is distinguishable, because there the taxpayer faced a liability subject to a condition subsequent.  77 F.2d at 327.  The court treated a condition subsequent as an event that erases a preexisting liability rather than as an event upon which liability is conditioned. *Id*.  *Accord Lawyers' Title Guar. Fund v. United States*, 508 F.2d 1, 4-7 (5th Cir. 1975) (demonstrating the significance, in the application of the all events test, of the differences among an imperfect right subject to later perfection, a condition precedent, and a vested right subject to divestment).  Unlike the taxpayer in *Russian Finance*, Valero faced a liability conditional upon a legal condition precedentSSthe sale of the stock.

that guarantees that the settling customers receive $115 million. As a formal matter, that may be precisely how the parties negotiated the transaction, but the parties' description of the transaction is irrelevant.[13]  That the majority's approach emphasizes form over substance is evidenced by the fact that its rationale collapses when only the form of the transaction changes.  If, for example, Valero had entered into the settlement agreement *before* the Texas Railroad Commission had ruled on the claims, the majority would not be able to argue that Valero had a fixed liability of $115 million in 1979.   Or, assume hypothetically that Valero paid the settling customers $115 million in cash and then "sold" the settlement agreement to another party, as an investment vehicle, for $115 million.  Once again, the majority's rationale for finding the liability to be fixed would disappear, but Valero's liability would not change.  The substance of the transaction is what matters, and the transaction was not a simple payment plan; the settling parties gave up a right to $115 million in cash for 1.15 million shares of stock and the promise to make up a *possible* shortfall.

The second problem with the majority opinion is that it fails to recognize that Valero's obligations are not measured by the value the customers received from Valero, but from how much it cost Valero to provide that value.  The majority argues that

---

[13] *United States v. Phillis*, 257 U.S. 156, 168 (1921) ("We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income laws enacted thereunder."); *White Castle Lumber & Shingle Co. v. United States*, 481 F.2d 1274, 1276 (5th Cir. 1973) ("For tax purposes, courts should not exalt form over substance . . . .").

because the settling customers gave up $115 million, Valero necessarily incurred a debt of $115 million.  That may be true as a matter of economic theory but not in the world of tax law.

As this court has recognized, the tax laws do not accurately reflect commercial accounting practice, and one reason for this is the "all events test."  *See Mooney Aircraft, Inc. v. United States*, 420 F.2d 400, 404-05 (5th Cir. 1970).  The purpose of 'accrual' accounting in the taxation context is to try to match, in the same taxable year, revenues with the expenses incurred in producing those revenues.  *Id*. at 403.  One accounting technique for matching expenses and revenues is the accrual of estimated future expenses.  *Id*.  But the method of matching revenues and future expenses is imperfect, because "the all events test is designed to protect tax revenues by '(insuring) that the taxpayer will not take deductions for expenditures that might never occur.'  If there is any doubt whether the liability will occur courts have been loath to interfere with the Commissioner's discretion [in] disallowing a deduction."  *Id*. at 406.

Focusing on the value paid to a taxpayer in return for an obligation runs roughshod over the very purpose of the all events test.  Under the majority's analysis, anytime a taxpayer enters into a contingent obligation in return for a sum certain, it would be able to take a deduction in the amount of the payment.  In this case, the majority's approachSSironically, supported by the CommissionerSSallows Valero to deduct expenses it did not incur.

-24-

According to the majority, Valero properly deducted
$115 million in 1979 for an obligation that actually cost it
$108.9 million,[14] so Valero is being allowed to deduct $6.1
million in phantom expenses.  Such abuse, however, is precisely
what the "all events" test is meant to prevent.  *See Mooney*, 420
F.2d at 410 (stating that "the very purpose of the 'all events
test' is to make sure that the taxpayer will not deduct expenses
that might never occur.").[15]

If, on the other hand, the "all events" test were properly
applied here, Valero would have been allowed to take a
$89.1 million deduction in 1979 and a $19.8 million deduction in
1984,[16]  i.e., deductions equal to its actual cost.  Valero and
future taxpayers would not be able to play the odds and hope for
the type of windfall the majority is willing to countenance.

III.

---

[14]  As the majority correctly points out, the trust fund received
approximately $95.2 million from transactions in the trust.  Valero made up the
shortfall with a $19.8 million payment in 1984.  Thus, Valero paid *only* $108.9
million to the settling customers, consisting of stock worth $89.1 million to the
trust and $19.8 million in cash.  The difference came from price changes in, and
dividends on, the stock.

[15] A number of plausible hypotheticals demonstrate that Valero's liability
was uncertain in 1979.  For example, if the trustee had disposed of the Series
A stock at $31 a share, the fund would have received $35.6 million from the sale.
Add to that the $34.5 million in dividends, and the trust would have a shortfall
of $44.7 million in 1984.  Because Valero had already provided shares worth
$89.1 million, its total liability under the Settlement Agreement would be
$133.8 million.  On the other hand, if the trustee had sold the stock at $53 per
share (and in fact, the trust sold 230,000 shares at $53.91), Valero's actual
cost would be $108.65 million.

[16] This is assuming, of course, that the Commissioner had not committed
what might be considered malpractice in the private sector.

Although the majority finds it unnecessary to reach the issue, I would hold that the duty of consistency does not prevent Valero from deducting the 1984 payment.  The duty of consistency is based on the equitable principle that "no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong."  *Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934).  "The duty of consistency is a doctrine that prevents a taxpayer from taking one position one year, and a contrary position in a later year, after the limitations period has run in the first year."  *Herrington v. Commissioner*, 854 F.2d 755, 757 (5th Cir. 1988).

The requirements for the application of the duty of consistency are "(1) a representation or report by the taxpayer; (2) on which the Commission[er] has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner."  Id. at 758.  If all elements of the test are met, the Commissioner may act as if the previous representation continued to be true, even if it is not. *Id.*

The Commissioner concedes that the third prong of the *Herrington* test has not been met in this case but asks us to be flexible in our approach to the "duty of consistency."  This argument is without merit.

-26-

*Herrington* requires that the taxpayer change its position *after* the statute of limitations has run.[17]  Logically, the duty of consistency protects the Commissioner from unscrupulous taxpayers who purposely change positions after limitations has run.  It does not protect the Commissioner from her own negligence, however.  Once she was on notice that Valero had changed its position on the 1979 deduction, the Commissioner should have challenged the deduction before limitations had run.

The Commissioner should be required to accept the consequences of her error.  Accordingly, I respectfully dissent.[18]

---

[17] *See Davoli v. Commissioner*, 68 T.C.M. (CCH) 104, 107 (1994) ("We have previously held that where, prior to the expiration of the statute of limitations with respect to the earlier year, the Commissioner knows or has reason to know of the erroneous deduction claimed by the taxpayer, the Commissioner must disallow the deduction for the year in which it is claimed rather than attempt to recoup the applicable tax in the subsequent year.");  *Southern Pac. Transp. Co. v. Commissioner*, 75 T.C. 497, 560 (1980) ("The doctrine of 'duty of consistency' or 'quasi-estoppel' does not apply where all pertinent facts are known to both the Commissioner and the taxpayer.  'It is said that when both parties know the facts, there is no reason to estop the taxpayer from changing his position with respect to the transaction.'").

[18] In its revised opinion, the majority points out that the result it reaches may have been different if Valero's obligation had been incurred after July 18, 1984, because of 26 U.S.C. § 461(h).  Maj. Op. at 17 n.7.  The "economic performance" exception to the all events test does not affect my analysis, however.

Section 461(h) modifies the all events test in limited situations where a taxpayer incurs a liability to make periodic payments over an indefinite period of time.  Prior to the enactment of § 461(h), the taxpayer could deduct the entire liability, even if the time period was uncertain, because the taxpayer's liability for payment was fixed and the amount of liability was determinable with reasonable accuracy. *See* BORIS I. BITTKER AND LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 105.6.4 (2d ed. 1992 & Supp. 1995).  The result was a windfall to the taxpayer because of the time value of money.  Section 461(h) closes the loophole and makes such payments deductible only after economic performance, even if the all events test is met.

The difference between the cases covered by § 461(h) and the case *sub judice* is obvious:  The liability incurred by Valero did not meet the requirements of the all events test in 1979.  To that extent, even if § 461(h) had been in force in 1979, it would not apply to this case.