**In re: DOW CORNING CORPORATION,**
**Debtor.**

No. 95–20512.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Oct. 30, 2001.

John M. Newman, Jr., Jones, Day,
Reavis & Pogue, Cleveland, OH, for Debt-
or.

John Lindquist, U.S. Department of Justice, Washington, DC, for United States.

### OPINION REGARDING DEDUCTIBILITY OF POSTPETITION INTEREST

ARTHUR J. SPECTOR, Chief Judge.

#### Introduction

The Internal Revenue Code ("IRC") generally permits corporations to deduct from income subject to federal tax "all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). Dow Corning Corporation ("the Debtor") is an "accrual basis taxpayer." Declaration of Gifford E. Brown at ¶ 30. *See generally* 26 U.S.C. § 446(c)(2) (The "accrual method" is a permissible "method[ ] of accounting" for purposes of "comput[ing] taxable income."); *Comm'r v. South Texas Lumber Co.*, 333 U.S. 496, 498, 68 S.Ct. 695, 92 L.Ed. 831 (1948) (Under the "accrual basis of accounting ... [,] all obligations of a company applicable to a year are listed as expenditures, whether paid that year or not, and all obligations to it incurred by others applicable to the year are set up as income on the same basis." With "cash basis" accounting, on the other hand, "annual net income is measured by the difference between actual cash received and paid out within the taxable year."). The Debtor included in its 1995 and 1996 federal tax returns deductions "attributable to postpetition interest expense on [its] ... pre-petition bank debt and other capital borrowings." Brown Declaration at ¶¶ 31 & 32. Interest on these obligations, which will hereafter be referred to as the "Institutional Debt," was calculated at the interest rates speci-fied in the underlying loan agreements. *See* Debtor's Memo at p. 13.

The returns were audited by the Internal Revenue Service ("IRS") and, on November 30, 1998, the Debtor submitted to the auditing team an "informal claim ... for deduction of additional amounts of [postpetition] interest on pre-petition debt that had been erroneously omitted from the [1995 and 1996] return[s]." Brown Declaration at ¶ 34. *See also* Exhibit 26 of Brown Declaration. The indebtedness underlying this interest deduction "encompasses trade payables, forward contracts, swaps, and ... various ... settlement agreements" with, and prepetition judgments obtained by, certain tort creditors. Brown Declaration at ¶ 35. *See also id.* at ¶ 16. Hereafter, these disparate obligations will for convenience be collectively referred to as the "Trade Debt." In contrast to the Institutional Debt, the interest deduction relating to Trade Debt was not based on any contractual provisions. *See* Debtor's Memo at p. 9 (wherein the Debtor makes the rather implausible assertion that the Trade Debt "carried no contractual interest").[1] Consistent with 11 U.S.C. § 726(a)(5), the Trade Debt deductions were instead based on an interest rate of 6.28%—the federal judgment rate in effect when the Debtor filed its petition for bankruptcy relief. *See* Brown Declaration at ¶ 35; Debtor's Memo at p. 13; *see generally* 11 U.S.C. § 726(a)(5) (requiring that if the bankruptcy estate is sufficiently solvent, holders of claims against it are to be paid "interest at the legal rate from the date of the filing of the petition"); 11 U.S.C. § 1129(a)(7)(A)(ii) (To be confirmed, a plan must provide that each holder of a claim within an impaired, nonaccepting class "will receive ... property of

---

1. In this Court's experience, the vast majority of trade invoices bear a legend as boilerplate fixing a service charge for late payment.

a value ... that is not less than the amount that such holder would ... receive ... if the debtor were liquidated under chapter 7."); *In re Dow Corning Corp.,* 237 B.R. 380, 412 (Bankr.E.D.Mich.1999) (Section 726(a)(5) requires that interest be paid at "the federal judgment rate."); 28 U.S.C.A. § 1961(a) (West 1994) ("[I]nterest [on a money judgment] shall be ... at a rate equal to the coupon issue yield equivalent ... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment."); Historical & Statutory Notes foll. 28 U.S.C. A. § 1961 (West Supp. 2001) (indicating that the "Equivalent Coupon Issue Yield" on the last auction date before the Debtor filed its bankruptcy petition was 6.28%).

The IRS "rejected" the informal claim. Brown Declaration at ¶ 34. It also disallowed the Institutional Debt deductions. *Id.* at ¶ 33.

On behalf of the IRS, the United States filed a request for payment of certain administrative expenses. *See generally* 11 U.S.C. § 503. The Debtor objected to the request, which is based in substantial part on the government's contention that the foregoing deductions are improper. Both sides have filed a motion for partial summary judgment on this issue.

### Discussion

The Debtor argues that the interest obligations to which the deductions relate accrued during the 1995 and 1996 tax years—a contention which the United States disputes. We must therefore identify the standard for determining when accrual occurs for purposes of IRC § 163.

That standard is set out in IRC § 461. This statute refers to an "all events test," which "is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." 26 U.S.C. § 461(h)(4). As a general rule, "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1).

## I. The United States' Motion

The United States does not question that "economic performance" occurred with respect to the deductions at issue. *See generally In re West Texas Mktg. Corp.,* 155 B.R. 399, 403 (Bankr.N.D.Tex.), *aff'd,* No. 182–10034–7, 1993 WL 610926 (N.D.Tex. Dec.20, 1993), *aff'd,* 54 F.3d 1194 (5th Cir.1995) ("In the case of interest, economic performance occurs with the passage of time. H.R.CONF.REP. NO. 861, 98th Cong., 2d Sess. 875 [U.S.Code Cong. & Admin.News 1984, pp. 697, 1563] ...."); *compare* 26 U.S.C. § 461(h)(2)(D) (With exceptions not relevant here, "economic performance occurs at the time determined under regulations prescribed by the Secretary [of the Treasury].") *with* Treas. Reg. § 1.461–4(e), WL 26 CFR s 1.461–4 (2001) ("In the case of interest, economic performance occurs as the interest cost economically accrues, in accordance with the principles of relevant provisions of the Code."). It argues, however, that neither prong of the all-events test is satisfied.

### A. The Fixing of Liability

■ As indicated, an expense cannot be deducted unless "all events have occurred which determine the fact of liability." 26 U.S.C. § 461(h)(4). A more user-friendly description of this requirement is that the liability must be "fixed." *See United States v. Hughes Props., Inc.,* 476 U.S. 593, 600, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986) ("[T]o satisfy the all-events test, a liability must be 'final and definite in amount,' ... must be 'fixed and absolute,'

... and must be 'unconditional[ ]' ...." (citations omitted)).

The United States asserts that "the Debtor's postpetition interest obligation [was] ... contingent as a matter of law under 11 U.S.C. §§ 502(b)(2) and 1129." United States' Brief at p. 15. Alternatively, it argues that the obligation to pay postpetition interest is contingent by virtue of (i) 11 U.S.C. § 726(a); (ii) insolvency; or (iii) the Debtor having disputed such obligation.

### (i) Section 502(b)(2)

Section 502(b)(2) states that a claim to which an objection has been filed "shall [be] ... allow[ed] ..., except to the extent that ... such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). The United States argues that a creditor's right to postpetition interest is invalidated by this provision. *See* United States' Brief at pp. 11–13. This argument does not withstand analysis.

■ The net result of § 502(b)(2) is that, with an exception not relevant here,[2] claims for postpetition interest are subject to disallowance. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 373, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (referring to "the general rule disallowing postpetition interest," and citing § 502(b)(2)). Contrary to what the United States apparently believes, however, disallowance does not necessarily render a claim unenforceable.

■ As of the commencement of a bankruptcy case, a new entity—the bankruptcy "estate"—is created. 11 U.S.C. § 541(a). This estate acquires title to most property interests formerly held by the Debtor. *See id.* The Debtor and the estate, however, are separate and distinct legal entities. *See In re Thompson Boat Co.*, 252 F.3d 852, 854 (6th Cir.2001);[3] *cf.*

---

2. The allowed claim of an oversecured creditor includes postpetition interest to the extent of the collateral's value. *See* 11 U.S.C. § 506(b); *see also Rake v. Wade*, 508 U.S. 464, 468 n. 4, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) ("Under [§ 506(b)] ..., an oversecured creditor is entitled to postpetition interest on its claim only 'to the extent that such interest, when added to the principal amount of the claim,' does not 'exceed the value of the collateral.'" (citation omitted)). All obligations at issue here are unsecured. *See* Brown Declaration at ¶¶ 12, 16 & 26.

3. In this case, the Sixth Circuit "adopt[ed] ... as [its] own" the opinion of the district court. *Thompson Boat*, 252 F.3d at 854. Itself adopting the view of the bankruptcy court, the district court noted "[t]he distinct nature of the two entities [the debtor and the bankruptcy estate]," and in the "context" of that case saw "no good reason to disturb the debtor/trustee dichotomy." *Frank v. State of Michigan*, 261 B.R. 909, 912 (E.D.Mich. 1999), *aff'd*, 252 F.3d 852 (6th Cir.2001). *See also In re Thompson Boat Co.*, Case No. 93–20546, A.P. No. 99–2002 (August 5, 1999, unpublished at pp. 2–3). *See also, e.g., In re Durrett*, 187 B.R. 413, 419 (Bankr.D.N.H.

1995) ("[A]lthough the Court may agree that it is sometimes difficult to distinguish between the debtor-in-possession and the debtor, the Court still believes that the language of the Code validates the existence of the two as separate entities and will so hold."); *In re Winom Tool & Die, Inc.*, 173 B.R. 613, 623 (Bankr.E.D.Mich.1994) ("[T]he very manner in which the bankruptcy estate is defined necessarily implies that the debtor retains a status separate from his or its status as debtor in possession."); *id.* at 622 (While the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), "does imply that the debtor and debtor in possession are one and the same[,] ... the Court passed on the opportunity to render a definitive analysis ... [and] limit[ed] its 'same-entity' conclusion to the facts before it."); *see generally* 11 U.S.C. § 323(a) ("The trustee in a [bankruptcy] case ... is the representative of the estate."); 11 U.S.C. § 1107(a) ("[A] debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee ....").

26 U.S.C. § 6012(a)(9) (providing that an income tax return "shall be made by ... [e]very estate of an individual under chapter 7 or 11 of [the Bankruptcy Code] ... the gross income of which for the taxable year is not less than the sum of the exemption amount plus the standard deduction under [26 U.S.C.] section 63(c)(2)(D)"); 26 U.S.C. § 6012(b)(4) ("Returns of ... an estate of an individual under chapter 7 or 11 of [the Bankruptcy Code] ... shall be made by the fiduciary thereof."); Rev. Rul. 72–387, 1972–2 C.B. 632 ("[T]he bankrupt as an individual, and the estate in bankruptcy are separate taxable entities .... [T]he intervention of the status of bankruptcy into the affairs of ... an individual ... creates an entity separate and apart from the individual ... bankrupt.").[4]

■ The objective of the claims-allowance process is to identify those claims which are enforceable against the bankruptcy estate. Disallowance, therefore, does not necessarily mean that the claim is also invalid as against the debtor. *See, e.g., In re Kielisch,* 258 F.3d 315, 323 (4th Cir.2001); *In re Cousins,* 209 F.3d 38, 40–41 (1st Cir.2000).

Of course, the grounds for disallowance must be taken into account. The Code provides that a claim is not to be allowed if it is *"unenforceable* against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (emphasis added). Disallowance pursuant to this provision might very well bar the claim-holder from attempting to enforce the claim in subsequent proceedings against the debtor.

This result, however, has nothing to do with disallowance *per se.* By definition, disallowance based on § 502(b)(1) requires a determination that the subject claim is unenforceable against the debtor (or the debtor's property). Under those circumstances, the related doctrines of issue/claim preclusion are obviously implicated. *See In re Hanna,* 872 F.2d 829, 831 (8th Cir.1989).

■ The same cannot be said of § 502(b)(2). Since this provision is not predicated on the claim's invalidity, disallowance thereunder would not preclude the creditor from asserting a right to collect postpetition interest from the debtor. *See id.*

*Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964), supports this conclusion. Bruning obtained a bankruptcy discharge in 1953, and his case was closed the following year. *Id.* at 359, 84 S.Ct. 906. In 1958, the IRS applied income-tax refunds owed Bruning toward payment of interest on a tax debt that predated the bankruptcy. *Id.* Although the tax debt was nondischargeable, *id.* at 360, 84 S.Ct. 906, Bruning argued "that he was not liable for interest accruing ... after his petition in bankruptcy was filed." *Id.* at 359, 84 S.Ct. 906. Thus the setoff was improper, he argued, insofar as it was used to collect such interest. *See id.*

---

4. It appears that the corporate bankruptcy estate is irrelevant for federal tax purposes. *Compare* 26 U.S.C. § 6012(b)(3) ("In a case where a ... trustee in a case under [the Bankruptcy Code] ... has possession of or holds title to all or substantially all the property or business of a corporation ..., such ... trustee ... shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.") *with* 26 U.S.C. § 1399 ("Except in any case to which [26 U.S.C.] section 1398[, which pertains to individual bankruptcies,] applies, no separate taxable entity shall result from the commencement of a [bankruptcy] case ...."); *see* 15 Collier on Bankruptcy, ¶ TX 3.02[2][b] (15th ed. rev.2001) ("A separate taxable entity is not created upon (or as a result of) the commencement of a case by a corporation under the Bankruptcy Code.").

The Court ruled in favor of the IRS, *id.* at 363, 84 S.Ct. 906, reasoning that if a debt "survive[s] bankruptcy proceedings as a personal liability of the debtor," then Congress presumably "intended personal liability to continue as to the interest on that debt as well." *Id.* at 360, 84 S.Ct. 906. At a minimum, therefore, *Bruning* stands for the proposition that the disallowance of postpetition interest does not invalidate a claim for postpetition interest on a debt excepted from discharge.[5] But the decision has broader implications.

Bruning argued "that the traditional rule which denies postpetition interest as a claim against the bankruptcy estate also applies to discharge the debtor from personal liability for such interest even if the underlying ... debt is not discharged." *Id.* at 362, 84 S.Ct. 906. The Court rejected the argument in these terms:

> The basic reasons for the rule denying post-petition interest as a claim against the bankruptcy estate are the avoidance of unfairness as between competing creditors and the avoidance of administrative inconvenience. [footnote omitted] *These reasons are inapplicable to an action brought against the debtor personally.* In the instant case, collection of post-petition interest cannot inconvenience administration of the bankruptcy estate, cannot delay payment from the estate unduly, and cannot diminish the estate in favor of high interest creditors at the expense of other creditors. In *New York v. Saper*[, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949) ] ..., the Court found the reasons for the traditional rule applicable and held that post-petition interest on a claim for taxes was not to be allowed against the bankruptcy estate. *Here, we find the reasons—and thus the rule—inapplicable,* and we hold that post-petition interest on an unpaid tax debt not discharged ... remains, after bankruptcy, a personal liability of the debtor.

*Bruning,* 376 U.S. at 362–63, 84 S.Ct. 906 (emphasis added). *See also id.* at 363 n. 4, 84 S.Ct. 906 (observing that the "traditional rule" against postpetition interest "rests upon ... practical considerations," and quoting with apparent approval from a respected bankruptcy treatise which declared that "[t]he principle that interest stops running from the date of the filing of the petition in bankruptcy should be understood as a rule of liquidation practice rather than as a rule of substantive law" (quoting 3 Collier on Bankruptcy, at p. 1858 (14th ed.1961))).

█ *Bruning* thus makes clear that the "rule" against postpetition interest—a rule which § 502(b)(2) embodies, *see, e.g., Timbers of Inwood Forest,* 484 U.S. at 373, 108 S.Ct. 626 (quoted *supra* p. 398)—has no ramifications outside of the bankruptcy context. *See also In re Pardee,* 218 B.R. 916, 921–22 (9th Cir. BAP 1998), *aff'd,* 193 F.3d 1083 (9th Cir.1999); *id.* at 930 (Klein, J., concurring in pertinent part and dissenting on other grounds) ("Disallowance does not necessarily mean that the claim is invalid under non-bankruptcy law."); 4 Collier on Bankruptcy, ¶ 502.01 (15th ed. rev.2001) (Claims allowance "is exclusively a bankruptcy concept."). A claim for such interest therefore retains its validity even if it has been disallowed. So while it is true that, as against the estate, "interest

---

5. Although *Bruning* was decided under the Bankruptcy Act of 1898, 11 U.S.C. § 1 *et seq.* (repealed), the Act contained a provision closely analogous to current § 502(b)(2). *See In re Dow Corning Corp.,* 244 B.R. 678, 681–84 (Bankr.E.D.Mich.1999); *see also In re Par-*

dee, 218 B.R. 916, 921 (9th Cir. BAP 1998), *aff'd,* 193 F.3d 1083 (9th Cir.1999) (citing the decisions of "five circuit courts [which] have held that *Bruning* remains good law under the [Bankruptcy] Code").

stops accruing at the date of the filing of the petition," H.R. REP. NO. 95–595, at 353 (1977), U.S.Code Cong. & Admin.News 1978, at 5963, 6309; postpetition interest can accrue against the debtor notwithstanding § 502(b)(2). *See Kitrosser v. CIT Group/Factoring,* 177 B.R. 458, 471 (S.D.N.Y.1995) ("[I]nterest on Top Form's [debts] . . . continued to accrue during the pendency of [Top Form's] . . . bankruptcy . . ., and although CIT could not assert a claim against the bankruptcy estate for such interest, it continued as a debt of Top Form . . . .").

■ Section 1141(d) supports the foregoing proposition. Under that provision, plan confirmation generally discharges a debt against the debtor, "whether or not . . . the claim based on such debt . . . is allowed." 11 U.S.C. § 1141(d)(1)(A). This

clearly suggests that, but for the discharge, even a disallowed claim would continue to be valid: After all, the discharge of a disallowed claim would be superfluous if, as the United States argues, disallowance renders a claim unenforceable.

■ Courts have the "duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 2125, 150 L.Ed.2d 251 (2001) (citations and internal quotation marks deleted). Application of this principle to § 1141(d), in conjunction with the other considerations discussed, leads to the conclusion that in a chapter 11 proceeding, it is only upon discharge of an indebtedness that the corresponding interest obligation can be said to have been extinguished.[6] *See In re Cajun Elec. Power*

---

6. This point is recognized by a pre-Bankruptcy Code case upon which the United States heavily relies. *See In re Continental Vending Mach. Corp.,* No. 63–B–663, 1976 WL 913, at *6 (E.D.N.Y. Nov.19, 1976) ("A bankruptcy proceeding, whether straight or a corporate reorganization, . . . suspends or postpones the accrual of interest even though the 'claim has not lost its interest-bearing quality.' " (citation omitted)); *id.* at *6 n. 8 ("If . . . the debtor's assets are insufficient to pay the delinquent interest, the demands of creditors for interest would be discharged pursuant to 11 U.S.C. § 628, which provides in part: 'Upon the consummation of the plan, the judge shall enter a final decree . . . discharging the debtor from all its debts and liabilities . . . .' ").

*Continental Vending* is incorrect, however, insofar as it suggests that there can be no accrual unless the interest obligation is mature or, in the court's words, constitutes a "present liability." *Id.* at *5. As explained by the Supreme Court:

[T]he "all events" test . . . originated in *United States v. Anderson,* 269 U.S. 422 [46 S.Ct. 131, 70 L.Ed. 347] (1926). In *Anderson,* the Court held that a taxpayer was obliged to deduct from its 1916 income a tax on profits from munitions sales that took place in 1916. *Although the tax would not be assessed and therefore would not for-*

*mally be due until 1917, all the events which fixed the amount of the tax and determined the taxpayer's liability to pay it had occurred in 1916.* The test is now embodied in Treas Reg § 1.461–1(a)(2) . . ., which provides that "[u]nder an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." [footnote omitted]

It is fundamental to the "all events" test that, *although expenses may de deductible before they have become due and payable,* liability must first be firmly established.

*United States v. General Dynamics Corp.,* 481 U.S. 239, 242–43, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987) (emphasis added). *See also Natco Corp. v. United States,* 240 F.2d 398, 400 (3d Cir.1956) ("In the case of a taxpayer on the accrual basis of accounting an item of expense is to be regarded as incurred, and hence deductible as accrued, only in the year when the taxpayer's liability to pay it becomes definite and absolute, *whether or not it is presently . . . payable.*" (emphasis added; citation omitted)).

*General Dynamics* makes clear that an obligation may accrue even though it has not yet matured. Thus it makes no difference whether a creditor is temporarily precluded from

*Coop.*, 185 F.3d 446, 455 (5th Cir.1999) ("[A] debtor's obligation with respect to postpetition interest terminates only 'if and when' the debtor obtains a discharge from the bankruptcy court."); *cf. Kielisch*, 258 F.3d at 321 ("Section 502 does not 'freeze' the debt of the student loan debtor; interest continues to accrue during the pendency of the bankruptcy proceedings and, [by operation of 11 U.S.C. § 523(a)(8)] ..., the debtor remains personally liable for the full amount of the student loan debt."); *In re Vogt*, 250 B.R. 250, 265 (Bankr.M.D.La.2000) (Payment pursuant to 11 U.S.C. § 726(a) does not extinguish a creditor's right under nonbankruptcy law to collect additional sums from the debtor personally; "it is the discharge that precludes further collection efforts against the debtor.").

■ For these reasons, the Court rejects the government's contention that disallowance pursuant to § 502(b)(2) renders an interest obligation contingent. As against *the debtor*, the obligation remains in force.[7]

### (ii) Section 1129(b)(1)

■ One of the requirements for chapter 11 plan confirmation is that each class of creditors either accepts the plan or is unimpaired by its provisions. *See* 11 U.S.C. § 1129(a)(8). This requirement notwithstanding, a plan may be confirmed if it is deemed to be "fair and equitable" to an impaired, nonaccepting class. 11 U.S.C. § 1129(b)(1).

A claim is impaired if the proposed plan would not give full effect to the claimholder's prepetition contractual rights. *See* 11 U.S.C. § 1124; *Bank of America Nat'l*

*Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n. 14, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ("Claims are unimpaired if they retain all of their prepetition legal, equitable, and contractual rights against the debtor."). The gist of the government's position is that these disregarded rights become enforceable if and when the bankruptcy court declines to confirm a plan pursuant to § 1129(b)(1). *See* United States' Brief at pp. 12–13. This thesis—which is relevant only to the Institutional Debt—has things backwards.

■ Suppose a plan is submitted for judicial scrutiny which does not recognize a class of creditors' contractual right to postpetition interest. The class votes not to accept the plan for that reason, and the plan proponent pursues the § 1129(b)(1) "cramdown" option.

In this scenario, the impaired class does not have to establish its contractual right to postpetition interest: By definition, it is the existence of that right which obliges the plan proponent to attempt the cramdown. (If there were no such right, there would be no impairment, and § 1129(b)(1) would be inapplicable.) The burden is instead on the proponent to demonstrate that the plan is "fair and equitable" even though it would not honor the class's contract right. *See, e.g., In re Briscoe Enters.*, 994 F.2d 1160, 1165 (5th Cir.1993) (The debtor must prove by a preponderance of the evidence that its proposed plan of reorganization complies with § 1129(b).).

Given the nature of a cramdown proceeding, it is clear that a court's ruling against the proponent does not purport to

enforcing a right to postpetition interest. *See generally, e.g.,* 11 U.S.C. § 362(a)(3).

**7.** As noted earlier, allowance deals only with the enforceability of claims *against the estate*. Thus the government's reliance on

§ 502(b)(2) is particularly dubious if, as would seem to be the case, the Debtor's bankruptcy estate is essentially a non-entity from a tax standpoint. *See supra* n. 4.

"validate" the impaired class's contractual right to postpetition interest: The court has simply decided that the right cannot be *in* validated by the proponent. *See* 11 U.S.C. § 1141(a) (stating the general rule that "the provisions of a confirmed plan bind the debtor ... and any creditor ..., whether or not the claim ... of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan"); 11 U.S.C. § 1141(d)(1)(A) (stating the general rule that "the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation, ... whether or not ... a proof of the claim based on such debt is filed ... [,] such claim is allowed ... [,] or ... the holder of such claim has accepted the plan").

The United States points out that courts frequently describe postpetition interest as being a matter of equity. *See, e.g., United States v. Ron Pair Enters.*, 489 U.S. 235, 248, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re Kentucky Lumber Co.*, 860 F.2d 674, 676–77 (6th Cir.1988). Loosely speaking, this characterization is essentially correct insofar as chapter 11 cramdown is concerned: Section 1129(b)(1) does, after all, explicitly call for application of the "fair and equitable" standard. What must be remembered, however, is that the issue under that statute is *not* whether it would be fair to "award" postpetition interest. Rather, the issue is whether (or the extent to which) it would be fair to *deny* a creditor its right to such interest.

Using standard contract-law phraseology, cramdown under § 1129(b)(1) looms as a condition *subsequent* to contractual liability for postpetition interest, rather than a condition *precedent*. *See generally, e.g., Colorado Interstate Corp. v. CIT Group/Equipment Fin.*, 993 F.2d 743, 755 n. 18 (10th Cir.1993) ("A condition precedent is 'one which is to be performed before some right dependent thereon accrues.' Black's Law Dictionary 293 (6th ed.1990). A condition subsequent is 'a condition referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party ....' *Id.* at 294."). The United States does not assert that a liability remains "unfixed" so long as it is subject to a condition subsequent. There is authority, moreover, which indicates that such a contention would have been unavailing. *See, e.g., Burnham Corp. v. Comm'r*, 878 F.2d 86, 88–89 (2d Cir.1989); *Lawyers' Title Guar. Fund v. United States*, 508 F.2d 1, 6 (5th Cir.1975).

For these reasons, the Court finds no merit in the argument that a creditor's contractual right to postpetition interest arises upon denial of confirmation pursuant to § 1129(b)(1).

### (iii) Section 726(a)

Section 726(a) lays out the distribution scheme in chapter 7. Claims are divided into four levels of priority, with payment to levels two through four dependent upon there being estate funds remaining after disbursement to the higher level(s) of priority. *See* 11 U.S.C. § 726(a). If the estate has more than enough money to pay all four levels, then claim holders are entitled to "interest at the legal rate from the date of the filing of the petition." 11 U.S.C. § 726(a)(5).

Application of § 726(a) means that in a chapter 7 liquidation, creditors are entitled to postpetition interest only if the estate is sufficiently solvent to pay such interest. For this reason, the United States argues, the right to postpetition interest is not fixed. *See* United States' Brief at pp. 14–15 (citing *In re West Texas Mktg. Corp.*, 54 F.3d 1194 (5th Cir.1995)).

■ This argument makes sense insofar as Trade Debt is concerned, since the premise underlying the Debtor's deductions is that it is obligated to pay interest on such debt pursuant to § 726(a)(5). A right to interest which is based on this statute is, by definition, contingent on the estate having funds on hand to make that payment after satisfying all higher-priority claims. *See West Texas Marketing,* 54 F.3d at 1198 ("Implicit in the obligation under § 726 to pay postpetition interest ... is the necessary condition that sufficient assets remain following distributions under § 726(a)(1)-(4)."). This contingency means that the interest obligation is not fixed for purposes of IRC § 163(a). *Id.* ("[I]f, in the distribution of WTMC's assets in accordance with § 726(a)(1)-(4), all assets are depleted, then the estate will not have incurred any obligation to pay interest on unsecured claims. This is not due to the fact that payment became impossible, but because the condition necessary to create the liability for postpetition interest failed to occur."); *cf. Burlington–Rock Island R.R. v. United States,* 321 F.2d 817, 821 (5th Cir.1963) ("Under the terms of the Allocation Agreement, Burlington was required to make payments 'from time to time, insofar as its cash situation will reasonably permit.' Such a contract under Texas law would impose merely a conditional obligation on the debtor to pay, and he would be under no legal duty to make payments unless his financial situation permitted it. Thus a creditor could enforce such an obligation only by showing that the promisor had sufficient funds to make payment .... Burlington's duty to pay the statutory interest was thus contingent upon its financial situation, and no legal obligation could arise under the agreement until the occurrence of that contingency.").

The Debtor apparently concedes that a debt is unfixed if the repayment obligation is made contingent on the obligor's future solvency. *See* Debtor's Reply Brief at p. 6 (distinguishing *Burlington–Rock Island* as involving a "debt instrument[ ] whose very terms made the disbursement of interest contingent"). In any case, it offers no coherent argument as to why this proposition should be rejected.

The Debtor did assert that it has been solvent throughout the pendency of bankruptcy proceedings. *See* Brown Declaration at ¶¶ 17–19 & 21. The contingency under § 726(a)(5), however, is that the estate have funds on hand *after all claims have been paid,* which of course has yet to occur. Because solvency prior to final distribution is irrelevant, a chapter 11 debtor's § 726(a)(5)-based obligation to pay postpetition interest cannot become fixed until confirmation of a plan which, in conformity with § 1129(a)(7)(A)(ii), unconditionally obliges the debtor to pay such interest at the applicable judgment rate. Accordingly, the Court concludes that the Debtor's obligation to pay postpetition interest on the Trade Debt did not accrue during the 1995 and 1996 tax years. *See West Texas Marketing,* 54 F.3d at 1198 n. 9 & accompanying text.

■ The Institutional Debt, however, calls for a different analysis. The interest deductions relating to these liabilities is based on contract, not on § 726(a)(5).[8]

---

**8.** The Court reiterates that the Debtor does not assert that its deduction of accrued interest on Trade Debt arose from the contractual provisions with its individual trade creditors, but solely as a result of § 726(a)(5). As noted, *supra* n. 1, it is unlikely that none of the contracts with the hordes of trade creditors contains an interest provision, or a time price differential. In this day and age most trade invoices carry a legend such as "1½% per month service charge" as boilerplate. However, this opinion is based on what the Debtor argued and the justification it offered to the

The question presented, then, is whether this statute negates or impinges upon a creditor's contractual right to postpetition interest.

This Court previously expressed the view that even in the absence of a discharge, a chapter 7 creditor is precluded from enforcing a right to postpetition interest at a rate other than that allowed pursuant to § 726(a)(5). *See Dow Corning*, 237 B.R. at 411–12. At least one court has rejected this view. *See Vogt*, 250 B.R. at 264–65. But since the Debtor is not in chapter 7, there is no reason to revisit that issue: We will instead consider whether a *chapter 11* creditor is foreclosed by § 726(a)(5) from asserting a contractually-based right to postpetition interest.

In this regard, a pre-Bankruptcy Code chapter X case cited by the government, *In re Continental Vending Mach. Corp.*, No. 63–B–663, 1976 WL 913 (E.D.N.Y. Nov.19, 1976), seemingly supports the government's position. *See id.* at *4–6. However, *Continental Vending* implicitly assumes that the paradigm for distribution of estate assets in a liquidation proceeding—now codified in the form of § 726(a)—applies with equal force to a re-organization. Whatever validity this assumption may have had under chapter X, it cannot be reconciled with the current statutory scheme.

Section 726(a)(5) is pertinent to chapter 11 only for purposes of determining compliance with § 1129(a)(7)(A)(ii)'s "best interest of creditors" test. *See Dow Corning*, 244 B.R. at 686; 11 U.S.C. § 103(b). Use of this statutory benchmark dictates that a plan cannot be confirmed unless, in the case of a sufficiently solvent debtor, an impaired, nonaccepting creditor is paid postpetition interest at the federal judgment rate. *See Dow Corning*, 237 B.R. at 394, 412. Thus the interplay of §§ 726(a)(5) and 1129(a)(7)(A)(ii) operates to confer on such a creditor the right to judgment-rate interest.[9] But it does not necessarily follow from this that the creditor loses whatever right it may have had to contract-rate interest. Nor does the Code offer any sound basis for drawing that conclusion.

Of course, a contractual right to interest may be rendered irrelevant in situations where the applicable contract rate is less than the applicable judgment rate. But this is not because §§ 726(a)(5) and

---

IRS for the deduction—not on what it might have argued.

9. The Debtor enthusiastically endorsed the view of the dissent in *West Texas Marketing*, according to which § 726(a)(5) simply incorporates the rate of interest which would govern under applicable state law. *See West Texas Marketing*, 54 F.3d at 1203 n. 5 (Smith, J., dissenting); *id.* at 1205; Debtor's Reply Brief at pp. 4–6. But if that view is accepted, then of course it made no sense for the Debtor to refer to the federal judgment rate in ascertaining the appropriate interest deduction for Trade Debt. The Debtor appears to be confused on this point. *Compare* Debtor's Supplemental Brief at p. 6 (Section 726(a) does not "re-establish some previously eliminated underlying obligation regarding interest.") *with* Debtor's Reply Brief at p. 5 ("Section

502(b)(2) ... directs courts to ignore pendency interest .... Section 726(a)(5) preserves the debtor's obligation to pay this debt ....)" (quoting *West Texas Marketing*, 54 F.3d at 1205 (Smith, J., dissenting)). At any rate, this Court has already rejected the proposition that § 726(a)(5) defers to state law. *See In re Dow Corning Corp.*, 237 B.R. 380, 394–412 (Bankr.E.D.Mich.1999). Rather than "preserv[ing] the debtor's obligation" to pay interest, *West Texas Marketing*, 54 F.3d at 1205 (Smith, J., dissenting), § 726(a)(5) establishes (or recognizes) a right which did not (and logically could not) exist prepetition—viz., the right, contingent on the availability of sufficient funds, to payment from the bankruptcy estate of interest on allowed claims at the rate specified by 28 U.S.C. § 1961(a). *See Dow Corning*, 237 B.R. at 391–94, 412.

1129(a)(7)(A)(ii) supplant or invalidate the contract right: It simply reflects the fact that the creditors' rights, while independent, are alternative rather than cumulative.[10]

The independent nature of a chapter 11 creditor's contractual rights is reflected in the cramdown provision, § 1129(b). Pursuant to that provision, the plan proponent must establish that the plan is fair and equitable to a nonaccepting, impaired class, even though the plan provides for payment to that class of postpetition interest at the § 726(a)(5)—mandated federal judgment rate. *See* 11 U.S.C. § 1129(b)(1). If the plan would pay the impaired class postpetition interest at a rate less than that to which it is contractually entitled, the proponent must satisfy the court that the plan is fair and equitable notwithstanding its failure to honor this contractual right. *See Dow Corning*, 244 B.R. at 694–96. Thus a proposed plan's compliance with §§ 1129(a)(7)(A)(ii)/ 726(a)(5) does not vitiate a creditor's right to interest at the contract rate: Such a right is preserved until such time as the plan is confirmed pursuant to § 1129(b). *See id.* at 686 ("[A] creditor's contractual right to interest retains validity during the pendency of chapter 11 reorganization.").

For the reasons discussed, the Court concludes that § 726(a) does not supplant or otherwise invalidate a chapter 11 creditor's contractual right to postpetition interest.

### (iv) Insolvency

There are two questions presented here. One is whether the Debtor's financial status during the 1995–1996 tax years was such that its ability to pay postpetition interest was jeopardized. The other, more basic question is whether the apparent inability to pay an obligation means that the obligation has not accrued. Because the Court answers the latter question in the negative, there is no need to address the former.

■ As a preliminary matter, we summarily reject the proposition that an unconditional payment obligation becomes contingent—i.e., conditional—in the event the obligor goes broke. Unless the parties to an agreement or applicable law stipulate otherwise, solvency is irrelevant to the question of whether a debt is contingent. *See generally, e.g., In re Ford*, 967 F.2d 1047, 1051 (5th Cir.1992) ("[C]laims are contingent as to liability if the debt is one which the debtor will be called upon to pay *only upon the occurrence or happening of an extrinsic event* which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred." (citation omitted)); *In re Barcal*, 213 B.R. 1008, 1013 (8th Cir. BAP 1997) ("Contingent debts ... involve no liability unless the condition precedent occurs ...." (citation omitted)); Black's Law Dictionary (7th ed. 1999) (A "contingent debt ... [is a] debt that is not presently fixed but that may become fixed in the future with the occurrence of some event.").

■ It may be, of course, that insolvency—while having no bearing on the contingency issue—nevertheless precludes a taxpayer from accruing expenses. In deciding whether that is so, the analytical starting point must be the pertinent statutory provisions. *See generally, e.g., Duncan*, 121 S.Ct. at 2124, 150 L.Ed.2d at 258 ("Our task is to construe what Congress

---

**10.** In such cases, the debtor could, of course, propose a plan which would leave the creditor's contractual rights unimpaired, thereby avoiding the best-interest test altogether.

has enacted. We begin, as always, with the language of the statute."). Neither § 163 nor § 461 of the IRC identifies solvency as a condition for deducting an interest obligation. *But see* 26 U.S.C. § 163(j) (discussed *infra* pp. 408–09). The question, then, is whether a court can limit the IRC § 163 deduction to solvent taxpayers notwithstanding the absence of an express statutory directive to that effect. This construction of the statute would be appropriate only if there is persuasive evidence that it effectuates Congressional intent, or if the statute would otherwise produce absurd results. *See generally William C. Dunn & Delta Consultants v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997) ("[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." (citations and internal quotations marks deleted)); *cf. Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1, 7 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (citations and internal quotations marks deleted)).

There are cases which at least arguably suggest that solvency is an appropriate consideration in determining a taxpayer's right under IRC § 163 to deduct accrued expenses. *See, e.g., Mooney Aircraft v. United States*, 420 F.2d 400, 410 n. 38 (5th Cir.1969); *Guardian Inv. Corp. v. Phinney*, 253 F.2d 326, 330 (5th Cir.1958); *In re Southwestern States Mktg. Corp.*, 179 B.R. 813, 817–18 (N.D.Tex.1994), *aff'd*, 82 F.3d 413 (5th Cir.1996) (unpublished); *Continental Vending*, 1976 WL 913 at *4; *Cohen v. Comm'r*, 21 T.C. 855, 856–57, 1954 WL 408 (T.C.1954). None of these cases, however, identify any legislative history which supports that proposition. Nor is this Court aware of any such history. Thus the imposition of some kind of solvency requirement in connection with IRC § 163 cannot be justified as reflecting the manifest will of Congress.

The next question is whether such a requirement is necessary to make sense of IRC § 163. An assumption underlying accrual-basis tax accounting, of course, is that the accrued expense will in fact eventually be paid by the taxpayer. *See Helvering v. Russian Fin. & Constr. Corp.*, 77 F.2d 324, 327 (2d Cir.1935). If that taxpayer is hopelessly insolvent, then it does seem a bit odd to nevertheless permit the expense to be deducted.

It is this sort of reasoning which underlies the conclusion that deeply insolvent taxpayers cannot deduct accrued expenses. *See, e.g., Continental Vending*, 1976 WL 913 at *6 ("[T]he 'all events test' ... is designed to ensure that the accrual-based taxpayer will not deduct expenses that might never occur."). There are, however, significant countervailing factors which *Continental Vending* and the other cases cited overlooked. One is the inherent difficulty of identifying the nature and extent of "solvency" to be required. Are courts to measure solvency by net worth (as the United States assumes, *see* United States' Brief at pp. 3 & 18), or liquidity? *See generally, e.g., United States v. Whitehead*, 176 F.3d 1030, 1040 (8th Cir.1999) ("The term 'insolvent' encompasses distinctly different meanings in the law. An insolvent person means someone who 'cannot pay his or her debts as they become due.' Neb.Rev.Stat. § 1–201(23) (Uniform Commercial Code) .... Insolvency also means a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.' ... 11 U.S.C. [§ ] 101(32)(A) ....."). And how far "in the red" must a taxpayer be in

order to warrant disallowance of a deducted expense?

Then there is the question of whether the burden and cost of enforcing a solvency requirement would be worthwhile. *Continental Vending* suggests that the targeted sub-group would be business entities on the verge of financial collapse.[11] *See Continental Vending*, 1976 WL 913 at *6. Since these entities are likely to be strapped for cash, it is not clear that the federal government would substantially enhance its revenues by disallowing their accrual-based deductions. Moreover, depriving them of an otherwise legitimate deduction may only serve to accelerate their demise—an unwelcome outcome for both the government (which loses a potential revenue source) and, especially, those who own or worked for the company put out of business. *Cf. Babin v. Comm'r*, 23 F.3d 1032, 1035 (6th Cir.1994) (stating that a rule created by the courts for the benefit of insolvent taxpayers "is premised on the belief that it is inequitable 'to kick someone when he is down'" (citation omitted)). Thus the benefits of "means testing" could be offset by the attendant costs.

This is not necessarily to suggest that some sort of solvency requirement would represent a poor policy choice. Decisions of that sort are, of course, for the legislative branch to make. *See generally, e.g.,*

*Hartford Underwriters*, 530 U.S. at 14–15, 120 S.Ct. at 1951, 147 L.Ed.2d at 11 ("[W]e do not sit to assess the relative merits of different approaches to various bankruptcy problems. It suffices that the natural reading of the [statutory] text produces the result we announce. Achieving a better policy outcome ... is a task for Congress, not the Courts."). Rather, our point is simply that Congress might rationally have opted to permit accrual-based deductions without regard to the taxpayer's financial status.

Various provisions of the IRC indicate that Congress did not intend to make solvency a pre-condition to expense accrual. *See generally United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 121 S.Ct. 1433, 149 L.Ed.2d 401, 417 (2001) ("[S]tatutory construction is a holistic endeavor[,] and ... the meaning of a provision is clarified by the remainder of the statutory scheme ... [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citation and internal quotation marks omitted)). Consider IRC § 163(j), which imposes narrowly defined limits on interest deductions if the corporation's "ratio of debt to equity ... exceeds 1.5 to 1." 26 U.S.C. § 163(j)(2)(A)(ii). *See also* 26 U.S.C. § 163(j)(2)(C) ("[T]he term 'ratio of debt .to equity' means the ratio which the total indebtedness of the

---

**11.** The bar could be raised by, for example, disallowing the deductions of *all* insolvent taxpayers, rather than just the economically moribund. But in so doing, of course, one substantially increases the likelihood that taxpayers will be denied deductions for accrued expenses which are subsequently paid. In such situations, the deductions will have in effect been rejected on the basis of a false prediction—namely, that the taxpayer won't be able to pay the deducted expense. This patently unfair outcome may be remediable through a corresponding adjustment in the return for a subsequent tax year. *See infra* pp. 33–35. But intervening IRC changes and/or the taxpayer's financial situation may be such that it is not feasible to "undo" the harm in this manner. An expansive definition of insolvency could also mean that greater numbers of taxpayers will opt to abandon accrual-based accounting, and could foster the perception that this method of accounting is unjustly reserved for only the wealthiest of corporations. *Cf. Continental Vending*, 1976 WL 913 at *6 ("If absolute certainty of payment were a prerequisite to accrual and deduction of interest, accrual methods of accounting and taxpaying would never be used.").

corporation bears to the sum of its money and all other assets reduced ... by such total indebtedness."). The logical inference to be drawn from this provision is that the only appropriate financial consideration with respect to interest deductibility is a corporation's debt-to-equity ratio. *See generally, e.g., Christensen v. Harris County,* 529 U.S. 576, 583, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("[W]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." (citation omitted)). Acceptance of the government's solvency argument, which is not based on such a ratio and which calls for prohibition rather than limitation of the interest deduction, would in effect either expand the scope of IRC § 163(j) or render it superfluous.

Another significant provision is § 166(a) of the I.R.C., which states:

(1) **Wholly worthless debts.**—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) **Partially worthless debts.**—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

26 U.S.C. § 166(a). This statute is noteworthy because it presupposes that an accrual-basis obligee must report as income any interest owed to it which accrues during the tax year, regardless of the obligor's financial health. *See generally* 26 U.S.C. § 451(a) ("The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period."); Treas. Reg. § 1.451–1(a), WL 26 CFR s 1.451–1 (2001) ("Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy."). Were it otherwise, of course, there would be no need (or legitimate purpose) for a statute authorizing the "worthless debt" deduction. After all, a taxpayer could not logically be permitted to deduct (pursuant to IRC § 166(a)) from income an obligation owed to it if that obligation was not already included as income (whether in the same or a prior tax year).

Section 166(a) of the IRC is also significant in that there is no analogous provision applicable to the party owing the (wholly or partially) worthless debt. This omission was presumably intentional. *Cf. Duncan,* 121 S.Ct. at 2120, 150 L.Ed.2d at 259 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations and internal quotation marks omitted)).

It is true that a taxpayer is generally required to report as income any debts owed which have been discharged. *See* 26 U.S.C. § 61(a)(12) ("[G]ross income means all income from whatever source derived, including ... [i]ncome from discharge of indebtedness."). But this, of course, implies that insolvency alone is not sufficient to trigger the reporting requirement. Rather, IRC § 61(a)(12) suggests that income is not realized unless and until a debt ceases to become legally enforceable. *See United States v. Centennial Sav. Bank,* 499 U.S. 573, 580 n. 6, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991) (As used in a statute related to IRC § 61(a), the phrase " 'income by reason of the discharge ... of indebtedness' ... refer[s] to the change in the debtor's financial condition when the

debtor is no longer legally required to satisfy his debt either in part or in full. 'Discharge' in this sense can occur only if the creditor cancels or forgives a repayment obligation."). Yet if insolvency disqualified a taxpayer from deducting an accrued expense, the net result would be the same as if that taxpayer were required to report the "unpayable" debt as income.

The most telling statute of all, however, is one which carves out an exception to IRC § 61(a)(12). Pursuant to IRC § 108(a)(1)(B), "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if ... *the discharge occurs when the taxpayer is insolvent.*" 26 U.S.C. § 108(a)(1)(B) (emphasis added). *Cf.* 26 U.S.C. § 108(a)(3) ("In the case of a discharge to which paragraph (1)(B) applies, the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent."); 26 U.S.C. § 108(a)(1)(A) (A bankruptcy-discharged debt is excluded from gross income.); 26 U.S.C. § 108(a)(2)(A) (Subparagraph (1)(B) "shall not apply to a discharge which occurs in" bankruptcy.).

The upshot of IRC § 108(1)(a)(1)(B)—which makes no distinction between accrual-basis taxpayers and those using other accounting methods—is that income realized by the discharge of a debt is not taxable if the debtor is insolvent. But if one were to accept the government's argument, that same taxpayer would in effect be required to pay tax on income realized, not through actual discharge of a debt, but by virtue of the taxpayer's inability to pay it.

The United States did not acknowledge this obvious incongruity, much less attempt to justify it. Nor do we think a plausible justification can be devised. In our view, the proposition that Congress intended to preclude insolvent taxpayers from deducting interest expenses as they accrue is irreconcilable with the relief afforded such taxpayers by IRC § 108(1)(a)(1)(B).

The Fifth Circuit suggested that disregarding a taxpayer's ability to pay in assessing the validity of a deduction for accrued interest is inconsistent with *Schlude v. Comm'r*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963), and *American Auto. Ass'n v. United States*, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961). *See Mooney Aircraft*, 420 F.2d at 410 n. 38. The court did not explain why this was so, however.

Nor do we see any inconsistency. In the cases cited by *Mooney Aircraft*, the issue was whether income that had either accrued or actually been received in one tax year could properly be deferred to a subsequent tax year. *See Schlude*, 372 U.S. at 131–34, 83 S.Ct. 601; *American Automobile*, 367 U.S. at 688–89, 81 S.Ct. 1727. The taxpayer's rationale for the deferral was that the income represented advance payment for services, some of which services would (or at least could) be performed by the taxpayer in the following year. *See id.* at 688–92, 81 S.Ct. 1727; *Schlude*, 372 U.S. at 131–32, 83 S.Ct. 601. The Court sided with the IRS, characterizing the taxpayer's income-allocation methodology as "artificial." *Id.* at 135, 83 S.Ct. 601; *American Automobile*, 367 U.S. at 691, 81 S.Ct. 1727.

The relevance of *American Automobile* and *Schlude* is hardly self-evident, since neither case even remotely involved the question of a party's ability to pay a particular expense. There is, moreover, another consideration which makes *Mooney Aircraft's* concern about these decisions especially puzzling.

In *American Automobile* and *Schlude,* the IRS did not challenge the taxpayer's deferral of income on the basis of failure to comply with the all-events test. Rather, it took the position—upheld by the Court—that the taxpayer's return did not "clearly reflect income." *See id.* at 688–89, 81 S.Ct. 1727; *Schlude,* 372 U.S. at 133–34, 83 S.Ct. 601. The IRS is explicitly granted the authority to reject a tax return on such grounds: Pursuant to IRC § 446(b), "[i]f ... the method [of accounting] used [by the taxpayer to compute taxable income] does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." 26 U.S.C. § 446(b). Moreover, a taxpayer's freedom to implement a particular accounting method—such as the "accrual method"—is explicitly made "[s]ubject to" IRC § 446(b). 26 U.S.C. § 446(c).

It is obvious from IRC §§ 446(b) and (c), and indeed *Mooney Aircraft* itself recognized, that compliance with the requirements of a particular accounting method does not necessarily mean that the method used "clearly reflects" the taxpayer's income. *See Mooney Aircraft,* 420 F.2d at 406 ("The 'all events test' ... is not the only basis upon which the Commissioner can disallow a deduction. Under [IRC] § 446(b) he has discretion to disallow any accounting method which does not clearly reflect income."). As explained by the Sixth Circuit:

> [S]atisfaction of the all events test by an accrual method taxpayer does not preempt the Commissioner's authority under [IRC] § 446(b) to determine that a taxpayer's method of accounting does not clearly reflect income.
>
> ... The all events test, which is merely a means devised to define the years in which income and deductions accrue, clearly is subordinate to the clear reflec-

tion standard contained in subsection (b). The tax court stated:

> ... [A] taxpayer's ability to use one or more of the methods of accounting listed in [IRC § ] 446(c) is contingent upon the satisfaction of subsection[ ] 446 ... (b).

*Ford Motor Co. v. Comm'r,* 71 F.3d 209, 213 (6th Cir.1995) (citation omitted). Thus a court's holding that the IRS properly invoked IRC § 446(b) does not warrant the inference that the reported income or expense was non-accruable.

It may be, of course, that a particular item of income or expense is both non-accruable *and* causes a distortion of income contrary to IRC § 446(b). However, neither *American Automobile* nor *Schlude* purported to rule against the taxpayer on the basis of the all-events test or some other standard relating to the determination of when accrual has occurred. Therefore, there is no tension between the Court's rulings and the proposition that expenses accrue without regard to the taxpayer's ability to pay.

For these reasons, the Court rejects the argument that IRC § 163 applies only to solvent taxpayers. *See West Texas Marketing,* 54 F.3d at 1197 (citing *Fahs v. Martin,* 224 F.2d 387 (5th Cir.1955), for the proposition that "interest for which an accrual basis taxpayer is ... unconditionally liable, but which is unlikely to be paid by reason of his insolvency, is still deductible"); *id.* at 1197 n. 5 (While "it was extremely unlikely that WTMC would be able to pay ... claims [against it,] ... this fact is not dispositive."); *Lawyers' Title,* 508 F.2d at 6 ("[A] bare possibility of non-payment ... because of the principal's financial condition does not defeat accrual ...."); *Fahs,* 224 F.2d at 393; *Keebey's, Inc. v. Paschal,* 188 F.2d 113, 115 (8th Cir.1951) ("While the existence of a liability is necessary, certainty that it will be

discharged is not .... [T]he interest was an ascertainable liability which we think should have accrued annually even though there was no reasonable probability that the taxpayer would ever be able to pay it."); *Zimmerman Steel Co. v. Comm'r*, 130 F.2d 1011, 1012 (8th Cir.1942) ("[W]here interest actually accrues on a debt of a taxpayer in a tax year the statute plainly says he may deduct it. That he has no ... expectation of paying it, but must go into bankruptcy ..., can not of itself justify denial of deduction ...."); Rev. Rul. 70–367, 1970—2 C.B. 37 (In this ruling, the IRS confronted the "question [of] ... whether the full amount of interest accrued during the year 1969 on the obligations of a railroad corporation that uses the accrual method of accounting is deductible from gross income for Federal income tax purposes, when the financial condition of the corporation is such that there is no reasonable expectancy that it will pay the accrued interest in full." It answered that question in the affirmative, stating that "doubt as to the payment of such interest is not a contingency of a kind that postpones the accrual of the liability until the contingency is resolved." [12]).

### (v) Disputing Liability

■ An unpaid liability is non-accruable to the extent that the taxpayer disputes its validity. *See* 26 U.S.C. § 461(f); Treas. Reg. § 1.461–1(a)(2)(ii), WL 26 CFR s 1.461–1 (2001); *see also Security Flour Mills Co. v. Comm'r*, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725 (1944); *Dixie Pine Prods. Co. v. Comm'r*, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270 (1944); *Fox v. Comm'r*, 874 F.2d 560, 564 (8th Cir.1989). The United States contends that the Debtor "initially asserted on December 2, 1996," that the holders of obligations "without stated interest should be limited in their recovery to 5% interest." United States' Brief at p. 15. As a consequence, the United States reasons, interest in excess of that rate should be deemed to have been disputed.

The "assertion" upon which this argument is presumably based was expressed in the form of the Debtor's original plan of reorganization, which was dated December 2, 1996. *See id.* at p. 5. It is true that this plan proposed to pay interest at the rate of 5% annually on Trade Debt. *See* Exhibit 13 of Brown Declaration (a copy of the 1996 plan), at ¶¶ 1.16 & 5.1; Brown Declaration at ¶¶ 23 & 26. And the Debtor concedes that the Trade Debt deductions are based on an interest rate greater than 5%—specifically, the "federal judgment rate of 6.28%." *Id.* at ¶ 35.

■ Contrary to what the United States implicitly assumes, however, the Debtor's proposal to pay 5% interest on Trade Debt does not constitute an assertion that the holders of such debt have no right to a higher rate. A plan of reorganization need not fully recognize a creditor's legal rights. *See* 11 U.S.C. §§ 1123(b)(1) & 1124(1). Thus a proposed plan cannot be construed as a declaration by its proponent as to the extent of such rights: It is instead more in the nature of a settlement offer, one which creditors are, of course, free to accept or reject as they deem appropriate. *See* 11 U.S.C. § 1126(a); *cf.* Brown Declaration at ¶ 22(b) (stating that the Debtor's debts "would not necessarily

---

12. The United States argued that "reliance" on this revenue ruling is "misplaced" because it involved a situation in which "the only contingency" relating to the interest obligation was whether there would be "available funds for payment." United States' Brief at p. 17. But, of course, the question here is whether fund "availability"—i.e., solvency—does in fact render an obligation non-accruable. The ruling directly addressed that question, and it is therefore very much on point.

be paid all in cash or exactly on the schedule called for by the original agreements," and noting that "a 'compromise' of this very sort was contained in the plan confirmed by the Bankruptcy Court"). The Court, therefore, dismisses as irrelevant the fact that the Debtor's original plan called for payment of postpetition interest on Trade Debt at less than the federal judgment rate.

■ With regard to the holders of Institutional Debt, the United States points out that the Debtor "contended that claims for postpetition interest were limited as a matter of right to ... the federal judgment rate." United States' Brief at pp. 15–16. If the Debtor had made such an argument during the tax years in question, 1995 and 1996, then the contract-based interest owed to these creditors would be disputed insofar as it exceeded the judgment rate. The United States does not allege, however, that such was the case. Rather, it implicitly concedes that it was not until 1998 that the Debtor asserted that creditors "with stated interest" were bound to accept the federal-judgment rate. *See id.* at p. 5; Exhibit 16 of Brown Declaration (copy of plan dated and filed November 9, 1998), at ¶¶ 1.24 & 5.1 (providing for payment of postpetition interest at the federal-judgment rate on all class 4 claims, which included Institutional Debt).

The United States does not clearly explain the relevance of this belated assertion on the part of the Debtor. As far as can be discerned, two theories might be postulated: (i) A liability which is disputed by the taxpayer after the close of the tax year can demonstrate that the taxpayer disputed the liability during the tax year (although the dispute was not yet manifest); or (ii) Even though a liability is undisputed at the close of the tax year in which it accrued, it is rendered non-accruable in that tax year to the extent the taxpayer subsequently disputes the amount owed.

The premise underlying the first theory is that one party need not communicate to the other its disagreement concerning the amount owed in order to warrant the conclusion that the liability is disputed. There is some support for this proposition. *See, e.g., Hillsboro Nat'l Bank v. Comm'r,* 460 U.S. 370, 377–84, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983) (arguably suggesting that an expense cannot properly be deducted to the extent that the taxpayer intends to challenge its validity). *But see Zimmerman Steel,* 130 F.2d at 1012 (indicating that an expense may properly be deducted even if the taxpayer "has no intention ... of paying it"); Treas. Reg. § 1.461–2(b)(2), WL 26 CFR § 1.461–2 (2001) ("An *affirmative act* denying the validity or accuracy ... of an asserted liability *to the person who is asserting such liability,* such as including a written protest with payment of the asserted liability, is sufficient to commence a contest." (emphasis added)). The government, however, did not address this issue. And in any case, the Court cannot for present purposes infer from the 1998 dispute that the Debtor disputed its contractual liability all along. *See, e.g., Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020 (6th Cir.2000) (The court "must view the entire record in a light most favorable to the party opposing summary judgment, and draw all reasonable inferences in that party's favor.").

The alternative theory is likewise unavailing. An accrual-basis taxpayer is not allowed to pick and choose the year in which it will deduct a liability; the timing of such a deduction is dictated by application of the all-events test. *See* 26 U.S.C. § 461(a) ("The amount of any deduction ... allowed by this subtitle *shall be taken for the taxable year which is the proper taxable year* under the method of account-

ing used in computing taxable income." (emphasis added)); *Security Flour Mills*, 321 U.S. at 286–87, 64 S.Ct. 596 (Neither the "Government [nor the] ... taxpayer ... [has] the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount."). Thus if a liability is fixed as of the close of the tax year, the taxpayer must claim the deduction in that tax year.[13] *See United States v. Consolidated Edison Co.*, 366 U.S. 380, 384, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961) ("[E]ach 'taxable year' must be treated as a separate unit, and *all items of gross income and deduction must be reflected in terms of their posture at the close of such year.*" (emphasis added)).

In keeping with this principle, the Debtor's interest obligations, which were undisputed in 1995 and 1996, had to be deducted in those tax years (assuming the deductibility requirements were otherwise satisfied). And a dispute arising in subsequent years over the extent of the interest obligation would have no bearing on the legitimacy of the deductions.

We derive this latter conclusion from the so-called "tax benefit" rule. As explained by the Supreme Court, this rule is

> a judicially developed principle that allays some of the inflexibilities of the annual accounting system. An annual accounting system is a practical necessity if the federal income tax is to produce revenue ascertainable and payable at

regular intervals.... Nevertheless, strict adherence to an annual accounting system would create transactional inequities. Often an apparently completed transaction will reopen unexpectedly in a subsequent tax year, rendering the initial reporting improper....

The purpose of the rule ... is to approximate the results produced by a tax system based on transactional rather than annual accounting.... It has long been accepted that a taxpayer using accrual accounting who accrues and deducts an expense in a tax year before it becomes payable and who for some reason eventually does not have to pay the liability must then take into income the amount of the expense earlier deducted....

The basic purpose of the tax benefit rule is to achieve rough transactional parity in tax ..., and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions than an event in a subsequent year proves to have been erroneous. Such an event, unforeseen at the time of an earlier deduction, may in many cases require the application of the tax benefit rule.... [T]he tax benefit rule will "cancel out" an earlier deduction ... when ... the later event is ... fundamentally inconsistent with the premise on which the deduction was initially based. That is, if that event had occurred within the same taxable year, it would have foreclosed the deduction.

---

**13.** The United States apparently would concede this point. *See* United States' Brief at p. 10 ("[A] deduction for interest may be taken on an accrual basis only in the year in which the taxpayer's liability to pay becomes fixed or is already existing; not in the year when the taxpayer decides that it is convenient or good business to pay or accrue the interest." (quoting *Guardian Inv. Corp. v. Phinney*, 253 F.2d 326, 330 (5th Cir.1958))); *id.* at p. 8 ("[A]n accrual method taxpayer must deduct an expense in the taxable year when all the events [have occurred that establish the fact of liability] giving rise to the deduction and the amount of the liability can be determined with reasonable accuracy." (quoting *Ford Motor Co. v. Comm'r*, 71 F.3d 209, 213 (6th Cir.1995))).

*Hillsboro,* 460 U.S. at 377–84, 103 S.Ct. 1134 (footnotes omitted).

A premise implicit in this rule is that a subsequent event does not affect the validity of a tax return: Rather, the taxpayer's (or the IRS's) recourse is to make (or require) a corresponding adjustment in the return for the tax year in which the event occurred. The Court acknowledged as much, observing that

> [w]hen the event proving the deduction improper occurs after the close of the taxable year, even if the statute of limitations has not run, the Commissioner's proper remedy is to invoke the tax benefit rule and require inclusion in the later year *rather than to re open* [sic] *the earlier year . . . .*
>
> Changes on audit reflect the proper tax treatment of items *under the facts as they were known at the end of the taxable year.* The tax benefit rule is addressed to a different problem—that of events that occur *after* the close of the taxable year [emphasis in original]. . . .
>
> "Congress has enacted an annual accounting system under which income is counted up at the end of each year. *It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system.*"

*Id.* at 378 n. 10, 103 S.Ct. 1134 (emphasis added, except as otherwise indicated; quoting *Healy v. Comm'r,* 345 U.S. 278, 284–85, 73 S.Ct. 671, 97 L.Ed. 1007 (1953)).

Based on the foregoing considerations, the Court holds that the dispute arising in 1998 regarding the continued validity of contractual interest rates is irrelevant to the 1995 and 1996 tax-year deductions for interest on Institutional Debt.

### B. Quantifying Liability

▇ An interest obligation does not accrue until the amount owed "can be determined with reasonable accuracy." 26 U.S.C. § 461(h)(4). The United States claims that this requirement is not met, citing (i) the Debtor's alleged insolvency and dependency on "co-insurance proceeds" from the Dow Chemical Company to fund the reorganization effort, United States' Brief at p. 18; (ii) the fact that, through its reorganization plans, the Debtor proposed repayment of the debts in question on "varying" terms and at "varying" interest rates, *id.;* and (iii) the Debtor's own assertion that it "was not possible . . . to estimate the fair market value" of the debts. *Id.* at p. 19.

The argument is unpersuasive. Solvency, of course, goes to the question of the Debtor's ability to pay its debts. It has nothing whatsoever to do with the question of whether those debts can be quantified with reasonable accuracy.

The ever-changing payment terms propounded by the Debtor are also irrelevant. There is no reason to suppose that these changes reflect anything more than negotiating strategies adopted by the Debtor at different stages in the bankruptcy proceedings. *See supra* pp. 412–13. Put simply, haggling over repayment terms does not demonstrate that a debt is unquantifiable.

▇ Similarly, the Debtor's assessment as to the difficulty of assessing the debts' "market value" is beside the point. The issue under IRC § 461(h)(4) is whether the task of quantifying interest is feasible, not whether the taxpayer struggled with that task. Thus it makes no difference if—as the United States seems to suggest—the Debtor had problems ascertaining the extent of its interest obligation.

The United States does not allege that the amount of interest owed by the Debtor

was insusceptible of reasonably accurate measure. To the contrary, the United States implicitly concedes that, if one rejects the theory that the Debtor had no obligation to pay postpetition interest unless required to do so under the terms of a confirmed plan (as the Court did, *see supra* section I), then the Debtor's interest liability could in fact be quantified. *See* United States' Brief at p. 6 ("Insofar as [the Debtor] was proposing to full [sic] pay these obligations with a combination of cash and Senior Notes . . . , *the only contingency preventing [the Debtor] from estimating the fair market value of these financial instruments was the fact that the court had not yet approved a plan under which the debtor would be liable for postpetition interest.*" (emphasis added)). The United States has therefore failed to demonstrate the absence of a "genuine issue" as to whether IRC § 461(h)(4)'s quantifiability requirement is satisfied. F.R.Civ.P. 56(c) (incorporated by F.R.Bankr.P. 7056 & 9014).

## II. The Debtor's Motion

As indicated *supra* p. 404, the United States is entitled to summary judgment regarding the validity of the Trade Debt deductions. To that extent, therefore, the Court must deny the Debtor's request for summary judgment in its favor.

▮ In this section, the Court considers the Debtor's motion insofar as it relates to the Institutional Debt deductions. The Debtor bears the burden of proving that the interest obligations relating to such debt in fact accrued in 1995 and 1996 as reported to the IRS. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (A ruling by the IRS disallowing a deduction "has the support of a presumption of correctness, and the [taxpayer] . . . has the burden of proving it to be wrong."); *LabelGraphics, Inc. v.*

*Comm'r,* 221 F.3d 1091, 1095 (9th Cir.2000) ("The burden is on the taxpayer to prove the merit of the deduction."); *Tool Producers, Inc. v. Comm'r,* No. 95–2056, 1996 WL 515344, at *2 (6th Cir. Sept.10, 1996) (unpublished; per curiam) (citing *Welch* in declaring that "[t]he burden is on the taxpayer to prove entitlement to a deduction"); *see also Raleigh v. Illinois Dep't of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13, 20, 23 (2000) (noting that "the [Bankruptcy] Code makes no provision for altering the burden [of proof] on a tax claim," and concluding that "in the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it").

The United States concedes that the economic-performance requirement is satisfied with respect to the deductions at issue here. *See supra* p. 397. And except for a purely legal argument which the Court rejects, it appears that the United States likewise does not question that the Debtor's contractual interest obligation is quantifiable. *See supra* p. 415; *see also* Brown Declaration at ¶ 12 ("The [loan] arrangements are without exception reflected in binding, written agreements which require . . . that [the Debtor] compensate the lenders for the use of their money by paying interest at specified rates."); *id.* at ¶ 15 ("Each [loan] agreement requires that [the Debtor] pay interest at an agreed rate on all unpaid principal."). Thus neither of these criteria warrant denial of the relief sought in the Debtor's motion.

▮ The Debtor must also satisfy the Court that, the government's argument to the contrary notwithstanding, the interest obligations which were deducted in 1995 and 1996 did in fact become fixed in those tax years. There is evidence to support

the Debtor's contention that this requirement was satisfied. *See id.* at ¶¶ 30–32.

In asserting that the interest liability was not fixed, the United States raised a number of arguments. We infer from the position taken by the United States that, apart from these arguments, it does not dispute the Debtor's contention that the interest obligation for Institutional Debt became fixed during the appropriate time frame. And since we have decided that the government's arguments are without merit, *see supra* section I, it seemingly follows that the Debtor has demonstrated the absence of a genuine issue regarding the fixing of liability.

There is, however, a loose end which must be addressed. As indicated *supra* p. 413, there is evidence that in the 1995 and 1996 tax years, the Debtor did not believe it was liable for postpetition interest at the contract rate. For purposes of considering the Debtor's motion, we must assume that such was in fact the case. *See Dews*, 231 F.3d at 1020 (quoted *supra* p. 413). It, therefore, was incumbent upon the Debtor to persuade the Court that this subjective belief is irrelevant to the question of whether a liability is disputed. *See* F.R.Civ.P. 56(c) (Summary judgment requires a determination that the movant is entitled to such relief "as a matter of law."). Because the Debtor made no attempt to do so, its motion will be denied insofar as it seeks a determination that the interest on Institutional Debt is fully deductible.

The government, however, pointed to no evidence suggesting that the Debtor ever took the position that the holders of Institutional Debt were entitled to postpetition interest at less than the federal judgment rate of 6.28%. Thus there is no basis for inferring that the Debtor disputed its liability to that extent. Accordingly, the Debtor's motion will be granted in part.

*Summary*

The United States is entitled to summary judgment on the question of whether it properly disallowed the interest deductions for Trade Debt. The Debtor is entitled to summary judgment on the question of whether it properly deducted interest liability on the Institutional Debt, but only to the extent such deductions reflect an interest rate of 6.28%. In all other respects, both parties' motions will be denied.